BELL, ATTORNEY GENERAL, ET AL. *v.* WOLFISH ET AL.

No. 77–1829.   Argued January 16, 1979—Decided May 14, 1979

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, and Blackmun, JJ., joined. Powell, J., filed an opinion concurring in part and dissenting in part, *post*, p. 563. Marshall, J., filed a dissenting opinion, *post*, p. 563. Stevens, J., filed a dissenting opinion, in which Brennan, J., joined, *post*, p. 579.

*Deputy Solicitor General Frey* argued the cause for petitioners. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Heymann, Kent L. Jones,* and *Sidney M. Glazer.*

*Phylis Skloot Bamberger* argued the cause for respondents. With her on the brief were *William E. Hellerstein, David J. Gottlieb,* and *Michael B. Mushlin.**

---

*Briefs of *amici curiae* urging affirmance were filed by *Jack Greenberg, James M. Nabrit III,* and *Joel Berger* for the NAACP Legal Defense and

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Over the past five Terms, this Court has in several decisions considered constitutional challenges to prison conditions or practices by convicted prisoners.[1] This case requires us to examine the constitutional rights of pretrial detainees—those persons who have been charged with a crime but who have not yet been tried on the charge. The parties concede that to ensure their presence at trial, these persons legitimately may be incarcerated by the Government prior to a determination of their guilt or innocence, *infra*, at 533–535, and n. 15; see 18 U. S. C. §§ 3146, 3148, and it is the scope of their rights during this period of confinement prior to trial that is the primary focus of this case.

This lawsuit was brought as a class action in the United States District Court for the Southern District of New York to challenge numerous conditions of confinement and practices at the Metropolitan Correctional Center (MCC), a federally operated short-term custodial facility in New York City designed primarily to house pretrial detainees. The District Court, in the words of the Court of Appeals for the Second Circuit, "intervened broadly into almost every facet of the institution" and enjoined no fewer than 20 MCC practices on constitutional and statutory grounds. The Court of Appeals largely affirmed the District Court's constitutional rulings and in the process held that under the Due Process Clause of the Fifth Amendment, pretrial detainees may "be subjected to only those 'restrictions and privations' which 'inhere in their confinement itself or which are justified by

Educational Fund, Inc., and by *Ralph I. Knowles, Jr.*, and *Alvin J. Bronstein* for the National Prison Project of the American Civil Liberties Union Foundation.

[1] See, *e. g., Hutto* v. *Finney*, 437 U. S. 678 (1978); *Jones* v. *North Carolina Prisoners' Labor Union*, 433 U. S. 119 (1977); *Bounds* v. *Smith*, 430 U. S. 817 (1977); *Meachum* v. *Fano*, 427 U. S. 215 (1976); *Wolff* v. *McDonnell*, 418 U. S. 539 (1974); *Pell* v. *Procunier*, 417 U. S. 817 (1974); *Procunier* v. *Martinez*, 416 U. S. 396 (1974).

compelling necessities of jail administration.'" *Wolfish* v. *Levi,* 573 F. 2d 118, 124 (1978), quoting *Rhem* v. *Malcolm,* 507 F. 2d 333, 336 (CA2 1974). We granted certiorari to consider the important constitutional questions raised by these decisions and to resolve an apparent conflict among the Circuits.[2] 439 U. S. 816 (1978). We now reverse.

## I

The MCC was constructed in 1975 to replace the converted waterfront garage on West Street that had served as New York City's federal jail since 1928. It is located adjacent to the Foley Square federal courthouse and has as its primary objective the housing of persons who are being detained in custody prior to trial for federal criminal offenses in the United States District Courts for the Southern and Eastern Districts of New York and for the District of New Jersey. Under the Bail Reform Act, 18 U. S. C. § 3146, a person in the federal system is committed to a detention facility only because no other less drastic means can reasonably ensure his presence at trial. In addition to pretrial detainees, the MCC also houses some convicted inmates who are awaiting sentencing or transportation to federal prison or who are serving generally relatively short sentences in a service capacity at the MCC, convicted prisoners who have been lodged at the facility under writs of habeas corpus *ad prosequendum* or *ad testificandum* issued to ensure their presence at upcoming trials, witnesses in protective custody, and persons incarcerated for contempt.[3]

---

[2] See, *e. g., Norris* v. *Frame,* 585 F. 2d 1183 (CA3 1978); *Campbell* v. *McGruder,* 188 U. S. App. D. C. 258, 580 F. 2d 521 (1978); *Wolfish* v. *Levi,* 573 F. 2d 118 (CA2 1978) (case below); *Feeley* v. *Sampson,* 570 F. 2d 364 (CA1 1978); *Main Road* v. *Aytch,* 565 F. 2d 54 (CA3 1977); *Patterson* v. *Morrisette,* 564 F. 2d 1109 (CA4 1977); *Miller* v. *Carson,* 563 F. 2d 741 (CA5 1977); *Duran* v. *Elrod,* 542 F. 2d 998 (CA7 1976).

[3] This group of nondetainees may comprise, on a daily basis, between 40% and 60% of the MCC population. *United States ex rel. Wolfish* v. *United States,* 428 F. Supp. 333, 335 (SDNY 1977). Prior to the District

The MCC differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates. It was intended to include the most advanced and innovative features of modern design of detention facilities. As the Court of Appeals stated: "[I]t represented the architectural embodiment of the best and most progressive penological planning." 573 F. 2d, at 121. The key design element of the 12-story structure is the "modular" or "unit" concept, whereby each floor designed to house inmates has one or two largely self-contained residential units that replace the traditional cellblock jail construction. Each unit in turn has several clusters or corridors of private rooms or dormitories radiating from a central 2-story "multipurpose" or common room, to which each inmate has free access approximately 16 hours a day. Because our analysis does not turn on the particulars of the MCC concept or design, we need not discuss them further.

When the MCC opened in August 1975, the planned capacity was 449 inmates, an increase of 50% over the former West Street facility. *Id.*, at 122. Despite some dormitory accommodations, the MCC was designed primarily to house these inmates in 389 rooms, which originally were intended for single occupancy. While the MCC was under construction, however, the number of persons committed to pretrial detention began to rise at an "unprecedented" rate. *Ibid.* The Bureau of Prisons took several steps to accommodate this unexpected flow of persons assigned to the facility, but despite these efforts, the inmate population at the MCC rose above its planned capacity within a short time after its opening. To provide sleeping space for this increased population, the MCC

Court's order, 50% of *all* MCC inmates spent less than 30 days at the facility and 73% less than 60 days. *United States ex rel. Wolfish* v. *Levi,* 439 F. Supp. 114, 127 (SDNY 1977). However, of the unsentenced detainees, over half spent less than 10 days at the MCC, three-quarters were released within a month and more than 85% were released within 60 days, *Wolfish* v. *Levi, supra,* at 129 n. 25.

replaced the single bunks in many of the individual rooms and dormitories with double bunks.[4] Also, each week some newly arrived inmates had to sleep on cots in the common areas until they could be transferred to residential rooms as space became available. See *id.*, at 127–128.

On November 28, 1975, less than four months after the MCC had opened, the named respondents initiated this action by filing in the District Court a petition for a writ of habeas corpus.[5] The District Court certified the case as a class action on behalf of all persons confined at the MCC, pretrial detainees and sentenced prisoners alike.[6] The petition served

---

[4] Of the 389 residential rooms at the MCC, 121 had been "designated" for "double-bunking" at the time of the District Court's order. 428 F. Supp., at 336. The number of rooms actually housing two inmates, however, never exceeded 73 and, of these, only 35 were rooms in units that housed pretrial detainees. Brief for Petitioners 7 n. 6; Brief for Respondents 11–12; App. 33–35 (affidavit of Larry Taylor, MCC Warden, dated Dec. 29, 1976).

[5] It appears that the named respondents may now have been transferred or released from the MCC. See *United States ex rel. Wolfish* v. *Levi, supra*, at 119. "This case belongs, however, to that narrow class of cases in which the termination of a class representative's claim does not moot the claims of the unnamed members of the class." *Gerstein* v. *Pugh*, 420 U. S. 103, 110 n. 11 (1975); see *Sosna* v. *Iowa*, 419 U. S. 393 (1975). The named respondents had a case or controversy at the time the complaint was filed and at the time the class action was certified by the District Court pursuant to Fed. Rule Civ. Proc. 23, and there remains a live controversy between petitioners and the members of the class represented by the named respondents. See *Sosna* v. *Iowa, supra*, at 402. Finally, because of the temporary nature of confinement at the MCC, the issues presented are, as in *Sosna* and *Gerstein*, "capable of repetition, yet evading review." 419 U. S., at 400–401; 420 U. S., at 110 n. 11; see *Kremens* v. *Bartley*, 431 U. S. 119, 133 (1977). Accordingly, the requirements of Art. III are met and the case is not moot.

[6] Petitioners apparently never contested the propriety of respondents' use of a writ of habeas corpus to challenge the conditions of their confinement, and petitioners do not raise that question in this Court. However, respondents did plead an alternative basis for jurisdiction in their "Amended Petition" in the District Court—namely, 28 U. S. C. § 1361—

up a veritable potpourri of complaints that implicated virtually every facet of the institution's conditions and practices. Respondents charged, *inter alia,* that they had been deprived of their statutory and constitutional rights because of overcrowded conditions, undue length of confinement, improper searches, inadequate recreational, educational, and employment opportunities, insufficient staff, and objectionable restrictions on the purchase and receipt of personal items and books.[7]

In two opinions and a series of orders, the District Court enjoined numerous MCC practices and conditions. With respect to pretrial detainees, the court held that because they

---

that arguably provides jurisdiction. And, at the time of the relevant orders of the District Court in this case, jurisdiction would have been provided by 28 U. S. C. § 1331 (a). Thus, we leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself. See *Preiser* v. *Rodriguez,* 411 U. S. 475, 499–500 (1973). See generally *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency,* 440 U. S. 391 (1979).

Similarly, petitioners do not contest the District Court's certification of this case as a class action. For much the same reasons as identified above, there is no need in this case to reach the question whether Fed. Rule Civ. Proc. 23, providing for class actions, is applicable to petitions for habeas corpus relief. Accordingly, we express no opinion as to the correctness of the District Court's action in this regard. See *Middendorf* v. *Henry,* 425 U. S. 25, 30 (1976).

[7] The Court of Appeals described the breadth of this action as follows:

"As an indication of the scope of this action, the amended petition also decried the inadequate phone service; 'strip' searches; room searches outside the inmate's presence; a prohibition against the receipt of packages or the use of personal typewriters; interference with, and monitoring of, personal mail; inadequate and arbitrary disciplinary and grievance procedures; inadequate classification of prisoners; improper treatment of non-English speaking inmates; unsanitary conditions; poor ventilation; inadequate and unsanitary food; the denial of furloughs, unannounced transfers; improper restrictions on religious freedom; and an insufficient and inadequately trained staff." 573 F. 2d, at 123 n. 7.

are "presumed to be innocent and held only to ensure their presence at trial, 'any deprivation or restriction of . . . rights beyond those which are necessary for confinement alone, must be justified by a compelling necessity.' " *United States ex rel. Wolfish* v. *Levi,* 439 F. Supp. 114, 124 (1977), quoting *Detainees of Brooklyn House of Detention* v. *Malcolm,* 520 F. 2d 392, 397 (CA2 1975). And while acknowledging that the rights of sentenced inmates are to be measured by the different standard of the Eighth Amendment, the court declared that to house "an inferior minority of persons . . . in ways found unconstitutional for the rest" would amount to cruel and unusual punishment. *United States ex rel. Wolfish* v. *United States,* 428 F. Supp. 333, 339 (1977).[8]

Applying these standards on cross-motions for partial summary judgment, the District Court enjoined the practice of housing two inmates in the individual rooms and prohibited enforcement of the so-called "publisher-only" rule, which at the time of the court's ruling prohibited the receipt of all books and magazines mailed from outside the MCC except those sent directly from a publisher or a book club.[9] After a trial on the remaining issues, the District Court enjoined, *inter alia,* the doubling of capacity in the dormitory areas, the use of the common rooms to provide temporary sleeping accommodations, the prohibition against inmates' receipt of packages containing food and items of personal property, and the practice of requiring inmates to expose their body cavities for visual inspection following contact visits. The court also

---

[8] While most of the District Court's rulings were based on constitutional grounds, the court also held that some of the actions of the Bureau of Prisons were subject to review under the Administrative Procedure Act (APA) and were "arbitrary and capricious" within the meaning of the APA. 439 F. Supp., at 122–123, 141; see n. 11, *infra.*

[9] The District Court also enjoined confiscation of inmate property by prison officials without supplying a receipt and, except under specified circumstances, the reading and inspection of inmates' outgoing and incoming mail. 428 F. Supp., at 341–344. Petitioners do not challenge these rulings.

granted relief in favor of pretrial detainees, but not convicted inmates, with respect to the requirement that detainees remain outside their rooms during routine inspections by MCC officials.[10]

The Court of Appeals largely affirmed the District Court's rulings, although it rejected that court's Eighth Amendment analysis of conditions of confinement for convicted prisoners because the "parameters of judicial intervention into . . . conditions . . . for sentenced prisoners are more restrictive than in the case of pretrial detainees." 573 F. 2d, at 125.[11] Ac-

---

[10] The District Court also granted respondents relief on the following issues: classification of inmates and movement between units; length of confinement; law library facilities; the commissary; use of personal typewriters; social and attorney visits; telephone service; inspection of inmates' mail; inmate uniforms; availability of exercise for inmates in administrative detention; food service; access to the bathroom in the visiting area; special diets for Muslim inmates; and women's "lock-in." 439 F. Supp., at 125–165. None of these rulings are before this Court.

[11] The Court of Appeals held that "[a]n institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety." 573 F. 2d, at 125.

The Court of Appeals also held that the District Court's reliance on the APA was erroneous. See n. 8, *supra*. The Court of Appeals concluded that because the Bureau of Prisons' enabling legislation vests broad discretionary powers in the Attorney General, the administration of federal prisons constitutes " 'agency action . . . committed to agency discretion by law' " that is exempt from judicial review under the APA, at least in the absence of a breach of a specific statutory mandate. 573 F. 2d, at 125; see 5 U. S. C. § 701 (a) (2). Because of its holding that the APA was inapplicable to this case, the Court of Appeals reversed the District Court's rulings that the bathroom in the visiting area must be kept unlocked, that prison officials must make a certain level of local and long-distance telephone service available to MCC inmates, that the MCC must maintain unchanged its present schedule for social visits, and that the MCC must take commissary requests every other day. 573 F. 2d, at 125–126, and n. 16. Respondents have not cross petitioned from the Court of Appeals' disposition of the District Court's Eighth Amendment and APA rulings.

cordingly, the court remanded the matter to the District Court for it to determine whether the housing for sentenced inmates at the MCC was constitutionally "adequate." But the Court of Appeals approved the due process standard employed by the District Court in enjoining the conditions of pretrial confinement. It therefore held that the MCC had failed to make a showing of "compelling necessity" sufficient to justify housing two pretrial detainees in the individual rooms. *Id.*, at 126–127. And for purposes of our review (since petitioners challenge only some of the Court of Appeals' rulings), the court affirmed the District Court's granting of relief against the "publisher-only" rule, the practice of conducting body-cavity searches after contact visits, the prohibition against receipt of packages of food and personal items from outside the institution, and the requirement that detainees remain outside their rooms during routine searches of the rooms by MCC officials. *Id.*, at 129–132.[12]

## II

As a first step in our decision, we shall address "double-bunking" as it is referred to by the parties, since it is a condition of confinement that is alleged only to deprive pretrial detainees of their liberty without due process of law in contravention of the Fifth Amendment. We will treat in order the Court of Appeals' standard of review, the analysis which we believe the Court of Appeals should have employed,

---

[12] Although the Court of Appeals held that doubling the capacity of the dormitories was unlawful, it remanded for the District Court to determine "whether any number of inmates in excess of rated capacity could be suitably quartered within the dormitories." *Id.*, at 128. In view of the changed conditions resulting from this litigation, the court also remanded to the District Court for reconsideration of its order limiting incarceration of detainees at the MCC to a period less than 60 days. *Id.*, at 129. The court reversed the District Court's rulings that inmates be permitted to possess typewriters for their personal use in their rooms and that inmates not be required to wear uniforms. *Id.*, at 132–133. None of these rulings are before the Court.

and the conclusions to which our analysis leads us in the case of "double-bunking."

### A

The Court of Appeals did not dispute that the Government may permissibly incarcerate a person charged with a crime but not yet convicted to ensure his presence at trial. However, reasoning from the "premise that an individual is to be treated as innocent until proven guilty," the court concluded that pretrial detainees retain the "rights afforded unincarcerated individuals," and that therefore it is not sufficient that the conditions of confinement for pretrial detainees "merely comport with contemporary standards of decency prescribed by the cruel and unusual punishment clause of the eighth amendment." 573 F. 2d, at 124. Rather, the court held, the Due Process Clause requires that pretrial detainees "be subjected to only those 'restrictions and privations' which 'inhere in their confinement itself or which are justified by compelling necessities of jail administration.'" *Ibid.*, quoting *Rhem* v. *Malcolm*, 507 F. 2d, at 336. Under the Court of Appeals' "compelling necessity" standard, "deprivation of the rights of detainees cannot be justified by the cries of fiscal necessity, . . . administrative convenience, . . . or by the cold comfort that conditions in other jails are worse." 573 F. 2d, at 124. The court acknowledged, however, that it could not "ignore" our admonition in *Procunier* v. *Martinez*, 416 U. S. 396, 405 (1974), that "courts are ill equipped to deal with the increasingly urgent problems of prison administration," and concluded that it would "not [be] wise for [it] to second-guess the expert administrators on matters on which they are better informed." 573 F. 2d, at 124.[13]

---

[13] The NAACP Legal Defense and Educational Fund, Inc., as *amicus curiae,* argues that federal courts have inherent authority to correct conditions of pretrial confinement and that the practices at issue in this case violate the Attorney General's alleged duty to provide inmates with "suitable quarters" under 18 U. S. C. § 4042 (2). Brief for the NAACP

Our fundamental disagreement with the Court of Appeals is that we fail to find a source in the Constitution for its compelling-necessity standard.[14] Both the Court of Appeals and the District Court seem to have relied on the "presumption of innocence" as the source of the detainee's substantive right to be free from conditions of confinement that are not justified by compelling necessity. 573 F. 2d, at 124; 439 F. Supp., at 124; accord, *Campbell* v. *McGruder,* 188 U. S. App. D. C. 258, 266, 580 F. 2d 521, 529 (1978); *Detainees of Brooklyn House of Detention* v. *Malcolm,* 520 F. 2d 392, 397 (CA2 1975); *Rhem* v. *Malcolm, supra,* at 336. But see *Feeley* v. *Sampson,* 570 F. 2d 364, 369 n. 4 (CA1 1978); *Hampton* v. *Holmesburg Prison Officials,* 546 F. 2d 1077, 1080 n. 1 (CA3 1976). But the presumption of innocence provides no support for such a rule.

---

Legal Defense and Educational Fund, Inc., as *Amicus Curiae* 22–46. Neither argument was presented to or passed on by the lower courts; nor have they been urged by either party in this Court. Accordingly, we have no occasion to reach them in this case. *Knetsch* v. *United States,* 364 U. S. 361, 370 (1960).

[14] As authority for its compelling-necessity test, the court cited three of its prior decisions, *Rhem* v. *Malcolm,* 507 F. 2d 333 (CA2 1974) (*Rhem I*); *Detainees of Brooklyn House of Detention* v. *Malcolm,* 520 F. 2d 392 (CA2 1975); and *Rhem* v. *Malcolm,* 527 F. 2d 1041 (CA2 1975) (*Rhem II*). *Rhem I*'s support for the compelling-necessity test came from *Brenneman* v. *Madigan,* 343 F. Supp. 128, 142 (ND Cal. 1972), which in turn cited no cases in support of its statement of the relevant test. *Detainees* found support for the compelling-necessity standard in *Shapiro* v. *Thompson,* 394 U. S. 618 (1969); *Tate* v. *Short,* 401 U. S. 395 (1971); *Williams* v. *Illinois,* 399 U. S. 235 (1970); and *Shelton* v. *Tucker,* 364 U. S. 479 (1960). But *Tate* and *Williams* dealt with equal protection challenges to imprisonment based on inability to pay fines or costs. Similarly, *Shapiro* concerned equal protection challenges to state welfare eligibility requirements found to violate the constitutional right to travel. In *Shelton,* the Court held that a school board policy requiring disclosure of personal associations violated the First and Fourteenth Amendment rights of a teacher. None of these cases support the court's compelling-necessity test. Finally, *Rhem II* merely relied on *Rhem I* and *Detainees.*

The presumption of innocence is a doctrine that allocates the burden of proof in criminal trials; it also may serve as an admonishment to the jury to judge an accused's guilt or innocence solely on the evidence adduced at trial and not on the basis of suspicions that may arise from the fact of his arrest, indictment, or custody, or from other matters not introduced as proof at trial. *Taylor* v. *Kentucky,* 436 U. S. 478, 485 (1978); see *Estelle* v. *Williams,* 425 U. S. 501 (1976); *In re Winship,* 397 U. S. 358 (1970); 9 J. Wigmore, Evidence § 2511 (3d ed. 1940). It is "an inaccurate, shorthand description of the right of the accused to 'remain inactive and secure, until the prosecution has taken up its burden and produced evidence and effected persuasion; . . .' an 'assumption' that is indulged in the absence of contrary evidence." *Taylor* v. *Kentucky, supra,* at 484 n. 12. Without question, the presumption of innocence plays an important role in our criminal justice system. "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin* v. *United States,* 156 U. S. 432, 453 (1895). But it has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun.

The Court of Appeals also relied on what it termed the "indisputable rudiments of due process" in fashioning its compelling-necessity test. We do not doubt that the Due Process Clause protects a detainee from certain conditions and restrictions of pretrial detainment. See *infra,* at 535–540. Nonetheless, that Clause provides no basis for application of a compelling-necessity standard to conditions of pretrial confinement that are not alleged to infringe any other, more specific guarantee of the Constitution.

It is important to focus on what is at issue here. We are not concerned with the initial decision to detain an accused and the curtailment of liberty that such a decision necessarily

entails. See *Gerstein* v. *Pugh,* 420 U. S. 103, 114 (1975); *United States* v. *Marion,* 404 U. S. 307, 320 (1971). Neither respondents nor the courts below question that the Government may permissibly detain a person suspected of committing a crime prior to a formal adjudication of guilt. See *Gerstein* v. *Pugh, supra,* at 111–114. Nor do they doubt that the Government has a substantial interest in ensuring that persons accused of crimes are available for trials and, ultimately, for service of their sentences, or that confinement of such persons pending trial is a legitimate means of furthering that interest. Tr. of Oral Arg. 27; see *Stack* v. *Boyle,* 342 U. S. 1, 4 (1951).[15] Instead, what *is* at issue when an aspect of pretrial detention that is not alleged to violate any express guarantee of the Constitution is challenged, is the detainee's right to be free from punishment, see *infra,* at 535–537, and his understandable desire to be as comfortable as possible during his confinement, both of which may conceivably coalesce at some point. It seems clear that the Court of Appeals did not rely on the detainee's right to be free from punishment, but even if it had that right does not warrant adoption of that court's compelling-necessity test. See *infra,* at 535–540. And to the extent the court relied on the detainee's desire to be free from discomfort, it suffices to say that this desire simply does not rise to the level of those fundamental liberty interests delineated in cases such as *Roe* v. *Wade,* 410 U. S. 113 (1973);

---

[15] In order to imprison a person prior to trial, the Government must comply with constitutional requirements, *Gerstein* v. *Pugh,* 420 U. S., at 114; *Stack* v. *Boyle,* 342 U. S., at 5, and any applicable statutory provisions, *e. g.,* 18 U. S. C. §§ 3146, 3148. Respondents do not allege that the Government failed to comply with the constitutional or statutory requisites to pretrial detention.

The only justification for pretrial detention asserted by the Government is to ensure the detainees' presence at trial. Brief for Petitioners 43. Respondents do not question the legitimacy of this goal. Brief for Respondents 33; Tr. of Oral Arg. 27. We, therefore, have no occasion to consider whether any other governmental objectives may constitutionally justify pretrial detention.

*Eisenstadt* v. *Baird,* 405 U. S. 438 (1972); *Stanley* v. *Illinois,* 405 U. S. 645 (1972); *Griswold* v. *Connecticut,* 381 U. S. 479 (1965); *Meyer* v. *Nebraska,* 262 U. S. 390 (1923).

## B

In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee.[16]  For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.[17]

---

[16] The Court of Appeals properly relied on the Due Process Clause rather than the Eighth Amendment in considering the claims of pretrial detainees.  Due process requires that a pretrial detainee not be punished.  A sentenced inmate, on the other hand, may be punished, although that punishment may not be "cruel and unusual" under the Eighth Amendment.  The Court recognized this distinction in *Ingraham* v. *Wright,* 430 U. S. 651, 671–672, n. 40 (1977):

"Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.  See *United States* v. *Lovett,* 328 U. S. 303, 317–318 (1946). . . . [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.  Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment."

[17] Mr. Justice Stevens in dissent claims that this holding constitutes a departure from our prior due process cases, specifically *Leis* v. *Flynt,* 439 U. S. 438 (1979), and *Paul* v. *Davis,* 424 U. S. 693 (1976). *Post,* at 580–581, and n. 6.  But as the citations following our textual statement indicate, we leave prior decisional law as we find it and simply apply it to the case at bar.  For example, in *Wong Wing* v. *United States,* 163 U. S. 228, 237 (1896), the Court held that the subjection of persons to punishment at hard labor must be preceded by a judicial trial to establish guilt.  And in *Ingraham* v. *Wright, supra,* at 674, we stated that "at least where school authorities, acting under color of state law, deliberately

See *Ingraham* v. *Wright,* 430 U. S. 651, 671–672 n. 40, 674 (1977) ; *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 165–167, 186 (1963) ; *Wong Wing* v. *United States,* 163 U. S. 228, 237 (1896). A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Gerstein* v. *Pugh, supra,* at 114; see *Virginia* v. *Paul,* 148 U. S. 107, 119 (1893). And, if he is detained for a suspected violation of a federal law, he also has had a bail hearing. See 18 U. S. C. §§ 3146, 3148.[18] Under such circumstances, the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restric-

---

decide to *punish* a child for misconduct by restraining the child and inflicting appreciable physical pain, we hold that Fourteenth Amendment liberty interests are implicated." (Emphasis supplied.) Thus, there is neither novelty nor inconsistency in our holding that the Fifth Amendment includes freedom from punishment within the liberty of which no person may be deprived without due process of law.

We, of course, do not mean by the textual discussion of the rights of pretrial detainees to cast doubt on any historical exceptions to the general principle that punishment can only follow a determination of guilt after trial or plea—exceptions such as the power summarily to punish for contempt of court. See, *e. g., United States* v. *Wilson,* 421 U. S. 309 (1975) ; *Bloom* v. *Illinois,* 391 U. S. 194 (1968) ; *United States* v. *Barnett,* 376 U. S. 681 (1964) ; *Cooke* v. *United States,* 267 U. S. 517 (1925) ; *Ex parte Terry,* 128 U. S. 289 (1888) ; Fed. Rule Crim. Proc. 42.

[18] The Bail Reform Act of 1966 establishes a liberal policy in favor of pretrial release. 18 U. S. C. §§ 3146, 3148. Section 3146 provides in pertinent part:

"Any person charged with an offense, other than an offense punishable by death, shall, at his appearance before a judicial officer, be ordered released pending trial on his personal recognizance or upon the execution of an unsecured appearance bond in an amount specified by the judicial officer, unless the officer determines, in the exercise of his discretion, that such a release will not reasonably assure the appearance of the person as required."

tions do not amount to punishment, or otherwise violate the Constitution.

Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense, however. Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

This Court has recognized a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may. See, e. g., Kennedy v. Mendoza-Martinez, supra, at 168; Flemming v. Nestor, 363 U. S. 603, 613–614 (1960); cf. De Veau v. Braisted, 363 U. S. 144, 160 (1960). In Kennedy v. Mendoza-Martinez, supra, the Court examined the automatic forfeiture-of-citizenship provisions of the immigration laws to determine whether that sanction amounted to punishment or a mere regulatory restraint. While it is all but impossible to compress the distinction into a sentence or a paragraph, the Court there described the tests traditionally applied to determine whether a governmental act is punitive in nature:

"Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding

of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions." 372 U. S., at 168–169 (footnotes omitted).

Because forfeiture of citizenship traditionally had been considered punishment and the legislative history of the forfeiture provisions "conclusively" showed that the measure was intended to be punitive, the Court held that forfeiture of citizenship in such circumstances constituted punishment that could not constitutionally be imposed without due process of law. *Id.*, at 167–170, 186.

The factors identified in *Mendoza-Martinez* provide useful guideposts in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word. A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. See *Flemming* v. *Nestor, supra*, at 613–617.[19] Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Kennedy* v. *Mendoza-Martinez, supra*, at 168–169; see *Flemming* v.

---

[19] As Mr. Justice Frankfurter stated in *United States* v. *Lovett*, 328 U. S. 303, 324 (1946) (concurring opinion): "The fact that harm is inflicted by governmental authority does not make it punishment. Figuratively speaking all discomforting action may be deemed punishment because it deprives of what otherwise would be enjoyed. But there may be reasons other than punitive for such deprivation."

*Nestor, supra,* at 617. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." [20] Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees. See *ibid.*[21] Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility. Cf. *United States* v. *Lovasco,* 431 U. S. 783, 790 (1977); *United States* v. *Russell,* 411 U. S. 423, 435 (1973).

One further point requires discussion. The petitioners assert, and respondents concede, that the "essential objective of pretrial confinement is to insure the detainees' presence at trial." Brief for Petitioners 43; see Brief for Respondents 33. While this interest undoubtedly justifies the original decision to confine an individual in some manner, we do not accept

_____

[20] This is not to say that the officials of a detention facility can justify punishment. They cannot. It is simply to say that in the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective. See *Kennedy* v. *Mendoza-Martinez,* 372 U. S., at 168; *Flemming* v. *Nestor,* 363 U. S., at 617. Retribution and deterrence are not legitimate nonpunitive governmental objectives. *Kennedy* v. *Mendoza-Martinez, supra,* at 168. Conversely, loading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution. But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish.

[21] "There is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." *Ingraham* v. *Wright,* 430 U. S., at 674.

respondents' argument that the Government's interest in ensuring a detainee's presence at trial is the *only* objective that may justify restraints and conditions once the decision is lawfully made to confine a person. "If the government could confine or otherwise infringe the liberty of detainees only to the extent necessary to ensure their presence at trial, house arrest would in the end be the only constitutionally justified form of detention." *Campbell* v. *McGruder,* 188 U. S. App. D. C., at 266, 580 F. 2d, at 529. The Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained. These legitimate operational concerns may require administrative measures that go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up at trial. For example, the Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees.[22] Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial. We need not here attempt to detail the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention. It is enough simply to recognize that in addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment.[23]

---

[22] In fact, security measures may directly serve the Government's interest in ensuring the detainee's presence at trial. See *Feeley* v. *Sampson,* 570 F. 2d, at 369.

[23] In determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed

## C

Judged by this analysis, respondents' claim that "double-bunking" violated their due process rights fails. Neither the District Court nor the Court of Appeals intimated that it considered "double-bunking" to constitute punishment; instead, they found that it contravened the compelling-necessity test, which today we reject. On this record, we are convinced as a matter of law that "double-bunking" as practiced at the MCC did not amount to punishment and did not, therefore, violate respondents' rights under the Due Process Clause of the Fifth Amendment.[24]

Each of the rooms at the MCC that house pretrial detainees has a total floor space of approximately 75 square feet. Each of them designated for "double-bunking," see n. 4, *supra,* contains a double bunkbed, certain other items of furniture, a wash basin, and an uncovered toilet. Inmates generally are locked into their rooms from 11 p.m. to 6:30 a.m. and for brief periods during the afternoon and evening head counts. During the rest of the day, they may move about freely between their rooms and the common areas.

Based on affidavits and a personal visit to the facility, the District Court concluded that the practice of "double-bunking" was unconstitutional. The court relied on two factors for its conclusion: (1) the fact that the rooms were designed to house only one inmate, 428 F. Supp., at 336–337; and (2) its judg-

---

our warning that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell* v. *Procunier,* 417 U. S., at 827; see *Jones* v. *North Carolina Prisoners' Labor Union,* 433 U. S. 119 (1977); *Meachum* v. *Fano,* 427 U. S. 215 (1976); *Procunier* v. *Martinez,* 416 U. S. 396 (1974).

[24] The District Court found that there were no disputed issues of material fact with respect to respondents' challenge to "double-bunking." 428 F. Supp., at 335. We agree with the District Court in this determination.

ment that confining two persons in one room or cell of this size constituted a "fundamental denia[l] of decency, privacy, personal security, and, simply, civilized humanity . . . ." *Id.,* at 339. The Court of Appeals agreed with the District Court. In response to petitioners' arguments that the rooms at the MCC were larger and more pleasant than the cells involved in the cases relied on by the District Court, the Court of Appeals stated:

> "[W]e find the lack of privacy inherent in double-celling in rooms intended for one individual a far more compelling consideration than a comparison of square footage or the substitution of doors for bars, carpet for concrete, or windows for walls. The government has simply failed to show any substantial justification for double-celling." 573 F. 2d, at 127.

We disagree with both the District Court and the Court of Appeals that there is some sort of "one man, one cell" principle lurking in the Due Process Clause of the Fifth Amendment. While confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment, nothing even approaching such hardship is shown by this record.[25]

---

[25] Respondents seem to argue that "double-bunking" was unreasonable because petitioners were able to comply with the District Court's order forbidding "double-bunking" and still accommodate the increased numbers of detainees simply by transferring all but a handful of sentenced inmates who had been assigned to the MCC for the purpose of performing certain services and by committing those tasks to detainees. Brief for Respondents 50. That petitioners were able to comply with the District Court's order in this fashion does not mean that petitioners' chosen method of coping with the increased inmate population—"double-bunking"—was unreasonable. Governmental action does not have to be the only alternative or even the best alternative for it to be reasonable, to say nothing of constitu-

Detainees are required to spend only seven or eight hours each day in their rooms, during most or all of which they presumably are sleeping. The rooms provide more than adequate space for sleeping.[26] During the remainder of the time, the detainees are free to move between their rooms and the common area. While "double-bunking" may have taxed some of the equipment or particular facilities in certain of the common areas, *United States ex rel. Wolfish* v. *United States,* 428 F. Supp., at 337, this does not mean that the conditions at the MCC failed to meet the standards required by the Constitution. Our conclusion in this regard is further buttressed by the detainees' length of stay at the MCC. See *Hutto* v. *Finney,* 437 U. S. 678, 686–687 (1978). Nearly all of the detainees are released within 60 days. See n. 3, *supra.* We simply do not believe that requiring a detainee to share toilet facilities and this admittedly rather small sleeping place with another person for generally a maximum period of 60 days violates the Constitution.[27]

tional. See *Vance* v. *Bradley,* 440 U. S. 93 (1979); *Dandridge* v. *Williams,* 397 U. S. 471, 485 (1970).

That petitioners were able to comply with the District Court order also does not make this case moot, because petitioners still dispute the legality of the court's order and they have informed the Court that there is a reasonable expectation that they may be required to "double-bunk" again. Reply Brief for Petitioners 6; Tr. of Oral Arg. 33–35, 56–57; see *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 632–633 (1953).

[26] We thus fail to understand the emphasis of the Court of Appeals and the District Court on the amount of walking space in the "double-bunked" rooms. See 573 F. 2d, at 127; 428 F. Supp., at 337.

[27] Respondents' reliance on other lower court decisions concerning minimum space requirements for different institutions and on correctional standards issued by various groups is misplaced. Brief for Respondents 41, and nn. 40 and 41; see, *e. g., Campbell* v. *McGruder,* 188 U. S. App. D. C. 258, 580 F. 2d 521 (1978); *Battle* v. *Anderson,* 564 F. 2d 388 (CA10 1977); *Chapman* v. *Rhodes,* 434 F. Supp. 1007 (SD Ohio 1977); *Inmates of Suffolk County Jail* v. *Eisenstadt,* 360 F. Supp. 676 (Mass. 1973); American Public Health Assn., Standards for Health Services in Correctional Institutions 62 (1976); American Correctional Assn., Manual of

## III

Respondents also challenged certain MCC restrictions and practices that were designed to promote security and order at the facility on the ground that these restrictions violated the Due Process Clause of the Fifth Amendment, and certain other constitutional guarantees, such as the First and Fourth Amendments. The Court of Appeals seemed to approach the challenges to security restrictions in a fashion different from the other contested conditions and restrictions. It stated that "once it has been determined that the mere fact of confinement of the detainee justifies the restrictions, the institution must be permitted to use reasonable means to insure that its legitimate interests in security are safeguarded." 573 F. 2d, at 124. The court might disagree with the choice of means to effectuate those interests, but it should not "second-guess the expert administrators on matters on which they are better informed . . . . Concern with minutiae of prison administration can only distract the court from detached consideration of the one overriding question presented to it: does the practice or condition violate the Constitution?" *Id.*, at 124–125. Nonetheless, the court affirmed the District Court's injunction

---

Standards for Adult Correctional Institutions, Standard No. 4142, p. 27 (1977); National Sheriffs' Assn., A Handbook on Jail Architecture 63 (1975). The cases cited by respondents concerned facilities markedly different from the MCC. They involved traditional jails and cells in which inmates were locked during most of the day. Given this factual disparity, they have little or no application to the case at hand. Thus, we need not and do not decide whether we agree with the reasoning and conclusions of these cases. And while the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question. For this same reason, the draft recommendations of the Federal Corrections Policy Task Force of the Department of Justice regarding conditions of confinement for pretrial detainees are not determinative of the requirements of the Constitution. See Dept. of Justice, Federal Corrections Policy Task Force, Federal Standards for Corrections (Draft, June 1978).

against several security restrictions. The court rejected the arguments of petitioners that these practices served the MCC's interest in security and order and held that the practices were unjustified interferences with the retained constitutional rights of *both* detainees and convicted inmates. *Id.*, at 129–132. In our view, the Court of Appeals failed to heed its own admonition not to "second-guess" prison administrators.

Our cases have established several general principles that inform our evaluation of the constitutionality of the restrictions at issue. First, we have held that convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison. See *Jones* v. *North Carolina Prisoners' Labor Union,* 433 U. S. 119, 129 (1977); *Meachum* v. *Fano,* 427 U. S. 215, 225 (1976); *Wolff* v. *McDonnell,* 418 U. S. 539, 555–556 (1974); *Pell* v. *Procunier,* 417 U. S. 817, 822 (1974). "There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff* v. *McDonnell, supra,* at 555–556. So, for example, our cases have held that sentenced prisoners enjoy freedom of speech and religion under the First and Fourteenth Amendments, see *Pell* v. *Procunier, supra; Cruz* v. *Beto,* 405 U. S. 319 (1972); *Cooper* v. *Pate,* 378 U. S. 546 (1964); that they are protected against invidious discrimination on the basis of race under the Equal Protection Clause of the Fourteenth Amendment, see *Lee* v. *Washington,* 390 U. S. 333 (1968); and that they may claim the protection of the Due Process Clause to prevent additional deprivation of life, liberty, or property without due process of law, see *Meachum* v. *Fano, supra; Wolff* v. *McDonnell, supra.* A fortiori, pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners.

But our cases also have insisted on a second proposition: simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations. "Lawful incarceration brings

about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price* v. *Johnston,* 334 U. S. 266, 285 (1948); see *Jones* v. *North Carolina Prisoners' Labor Union, supra,* at 125; *Wolff* v. *McDonnell, supra,* at 555; *Pell* v. *Procunier, supra,* at 822. The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights. *Jones* v. *North Carolina Prisoners' Labor Union, supra,* at 125; *Pell* v. *Procunier, supra,* at 822. There must be a "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Wolff* v. *McDonnell, supra,* at 556. This principle applies equally to pretrial detainees and convicted prisoners. A detainee simply does not possess the full range of freedoms of an unincarcerated individual.

Third, maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees.[28] "[C]entral to all other corrections goals is the institutional

---

[28] Neither the Court of Appeals nor the District Court distinguished between pretrial detainees and convicted inmates in reviewing the challenged security practices, and we see no reason to do so. There is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates. Indeed, it may be that in certain circumstances they present a greater risk to jail security and order. See, *e. g., Main Road* v. *Aytch,* 565 F. 2d, at 57. In the federal system, a detainee is committed to the detention facility only because no other less drastic means can reasonably assure his presence at trial. See 18 U. S. C. § 3146. As a result, those who are detained prior to trial may in many cases be individuals who are charged with serious crimes or who have prior records. They also may pose a greater risk of escape than convicted inmates. See Joint App. in Nos. 77–2035, 77–2135 (CA2), pp. 1393–1398, 1531–1532. This may be particularly true at facilities like the MCC, where the resident convicted inmates have been sentenced to only short terms of incarceration and many of the detainees face the possibility of lengthy imprisonment if convicted.

consideration of internal security within the corrections facilities themselves." *Pell* v. *Procunier, supra,* at 823; see *Jones v. North Carolina Prisoners' Labor Union, supra,* at 129; *Procunier* v. *Martinez,* 416 U. S. 396, 412 (1974). Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. *Jones* v. *North Carolina Prisoners' Labor Union, supra,* at 129; *Pell* v. *Procunier, supra,* at 822, 826; *Procunier* v. *Martinez, supra,* at 412–414.

Finally, as the Court of Appeals correctly acknowledged, the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Jones* v. *North Carolina Prisoners' Labor Union, supra,* at 128; *Procunier* v. *Martinez, supra,* at 404–405; *Cruz* v. *Beto, supra,* at 321; see *Meachum* v. *Fano,* 427 U. S., at 228–229.[29] "Such

---

[29] Respondents argue that this Court's cases holding that substantial deference should be accorded prison officials are not applicable to this case because those decisions concerned convicted inmates, not pretrial detainees. Brief for Respondents 52. We disagree. Those decisions held that courts should defer to the informed discretion of prison administrators because the realities of running a corrections institution are complex and difficult, courts are ill equipped to deal with these problems, and the management of these facilities is confided to the Executive and Legislative Branches, not to the Judicial Branch. See *Jones* v. *North Carolina Prisoners' Labor Union,* 433 U. S., at 126; *Pell* v. *Procunier,* 417 U. S., at 827; *Procunier* v. *Martinez,* 416 U. S., at 404–405. While those cases each concerned restrictions governing convicted inmates, the principle of deference enunciated in them is not dependent on that happenstance.

considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell* v. *Procunier,* 417 U. S., at 827.[30] We further observe that, on occasion, prison administrators may be "experts" only by Act of Congress or of a state legislature. But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial. *Procunier* v. *Martinez, supra,* at 405; cf. *Meachum* v. *Fano, supra,* at 229. With these teachings of our cases in mind, we turn to an examination of the MCC security practices that are alleged to violate the Constitution.

## A

At the time of the lower courts' decisions, the Bureau of Prisons' "publisher-only" rule, which applies to all Bureau

---

[30] What the Court said in *Procunier* v. *Martinez* bears repeating here: "Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism." *Ibid.*

facilities, permitted inmates to receive books and magazines from outside the institution only if the materials were mailed directly from the publisher or a book club. 573 F. 2d, at 129–130. The warden of the MCC stated in an affidavit that "serious" security and administrative problems were caused when bound items were received by inmates from unidentified sources outside the facility. App. 24. He noted that in order to make a "proper and thorough" inspection of such items, prison officials would have to remove the covers of hardback books and to leaf through every page of all books and magazines to ensure that drugs, money, weapons, or other contraband were not secreted in the material. "This search process would take a substantial and inordinate amount of available staff time." *Ibid.* However, "there is relatively little risk that material received directly from a publisher or book club would contain contraband, and therefore, the security problems are significantly reduced without a drastic drain on staff resources." *Ibid.*

The Court of Appeals rejected these security and administrative justifications and affirmed the District Court's order enjoining enforcement of the "publisher-only" rule at the MCC. The Court of Appeals held that the rule "severely and impermissibly restricts the reading material available to inmates" and therefore violates their First Amendment and due process rights. 573 F. 2d, at 130.

It is desirable at this point to place in focus the precise question that now is before this Court. Subsequent to the decision of the Court of Appeals, the Bureau of Prisons amended its "publisher-only" rule to permit the receipt of books and magazines from bookstores as well as publishers and book clubs. 43 Fed. Reg. 30576 (1978) (to be codified in 28 CFR § 540.71). In addition, petitioners have informed the Court that the Bureau proposes to amend the rule further to allow receipt of paperback books, magazines, and other soft-covered materials from any source. Brief for Petitioners 66 n. 49, 69, and n. 51. The Bureau regards hardback books as

the "more dangerous source of risk to institutional security," however, and intends to retain the prohibition against receipt of hardback books unless they are mailed directly from publishers, book clubs, or bookstores. *Id.,* at 69 n. 51. Accordingly, petitioners request this Court to review the District Court's injunction only to the extent it enjoins petitioners from prohibiting receipt of hard-cover books that are not mailed directly from publishers, book clubs, or bookstores. *Id.,* at 69; Tr. of Oral Arg. 59–60.[31]

We conclude that a prohibition against receipt of hardback books unless mailed directly from publishers, book clubs, or bookstores does not violate the First Amendment rights of MCC inmates. That limited restriction is a rational response by prison officials to an obvious security problem. It hardly

---

[31] Because of the changes in the "publisher-only" rule, some of which apparently occurred after we granted certiorari, respondents, citing *Sanks* v. *Georgia,* 401 U. S. 144 (1971), urge the Court to dismiss the writ of certiorari as improvidently granted with respect to the validity of the rule, as modified. Brief for Respondents 68. *Sanks,* however, is quite different from the instant case. In *Sanks* the events that transpired after probable jurisdiction was noted "had so drastically undermined the premises on which we originally set [the] case for plenary consideration as to lead us to conclude that, with due regard for the proper functioning of this Court, we should not . . . adjudicate it." 401 U. S., at 145. The focus of that case had been "completely blurred, if not altogether obliterated," and a judgment on the issues involved had become "potentially immaterial." *Id.,* at 152. This is not true here. Unlike the situation in *Sanks,* the Government has not substituted an entirely different regulatory scheme and wholly abandoned the restrictions that were invalidated below. There is still a dispute, which is not "blurred" or "obliterated," on which a judgment will not be "immaterial." Petitioners merely have chosen to limit their disagreement with the lower courts' rulings. Also, the question that is now posed is fairly comprised within the questions presented in the petition for certiorari. See Pet. for Cert. 2 ("[w]hether the governmental interest in maintaining jail security and order justifies rules that . . . (b) prohibit receipt at the jail of books and magazines that are not mailed directly from publishers"). See this Court's Rule 23 (1)(c). We, of course, express no view as to the validity of those portions of the lower courts' rulings that concern magazines or soft-cover books.

needs to be emphasized that hardback books are especially serviceable for smuggling contraband into an institution; money, drugs, and weapons easily may be secreted in the bindings. *E. g., Woods* v. *Daggett,* 541 F. 2d 237 (CA10 1976).[32] They also are difficult to search effectively. There is simply no evidence in the record to indicate that MCC officials have exaggerated their response to this security problem and to the administrative difficulties posed by the necessity of carefully inspecting each book mailed from unidentified sources. Therefore, the considered judgment of these experts must control in the absence of prohibitions far more sweeping than those involved here. See *Jones* v. *North Carolina Prisoners' Labor Union,* 433 U. S., at 128; *Pell* v. *Procunier,* 417 U. S., at 827.

Our conclusion that this limited restriction on receipt of hardback books does not infringe the First Amendment rights of MCC inmates is influenced by several other factors. The rule operates in a neutral fashion, without regard to the content of the expression. *Id.,* at 828. And there are alternative means of obtaining reading material that have not been shown to be burdensome or insufficient. "[W]e regard the

---

[32] The District Court stated: "With no record of untoward experience at places like the MCC, and with no history of resort to less restrictive measures, [petitioners'] invocation of security cannot avail with respect to the high constitutional interests here at stake." 428 F. Supp., at 340. We rejected this line of reasoning in *Jones* v. *North Carolina Prisoners' Labor Union,* 433 U. S., at 132–133, where we stated: "Responsible prison officials must be permitted to take reasonable steps to forestall . . . threat[s to security], and they must be permitted to act before the time when they can compile a dossier on the eve of a riot." We reject it again, now. In *Jones,* we also emphasized that the "informed discretion of prison officials that there is *potential* danger may be sufficient for limiting rights even though this showing might be 'unimpressive if . . . submitted as justification for governmental restriction of personal communication among members of the general public.'" (Emphasis added.) *Id.,* at 133 n. 9, quoting *Pell* v. *Procunier,* 417 U. S., at 825; see *Procunier* v. *Martinez,* 416 U. S., at 414.

available 'alternative means of [communication as] a relevant factor' in a case such as this where 'we [are] called upon to balance First Amendment rights against [legitimate] governmental . . . interests.' " *Id.,* at 824, quoting *Kleindienst* v. *Mandel,* 408 U. S. 753, 765 (1972); see *Cruz* v. *Beto,* 405 U. S., at 321, 322 n. 2. The restriction, as it is now before us, allows soft-bound books and magazines to be received from any source and hardback books to be received from publishers, bookstores, and book clubs. In addition, the MCC has a "relatively large" library for use by inmates. *United States ex rel. Wolfish* v. *United States,* 428 F. Supp., at 340.[33] To the limited extent the rule might possibly increase the cost of obtaining published materials, this Court has held that where "other avenues" remain available for the receipt of materials by inmates, the loss of "cost advantages does not fundamentally implicate *free speech* values." See *Jones* v. *North Carolina Prisoners' Labor Union, supra,* at 130–131. We are also influenced in our decision by the fact that the rule's impact on pretrial detainees is limited to a maximum period of approximately 60 days. See n. 3, *supra.* In sum, considering all the circumstances, we view the rule, as we now find it, to be a "reasonable 'time, place and manner' regulatio[n that is] necessary to further significant governmental interests . . . ." *Grayned* v. *City of Rockford,* 408 U. S. 104, 115 (1972); see *Cox* v. *New Hampshire,* 312 U. S. 569, 575–576 (1941); *Cox* v. *Louisiana,* 379 U. S. 536, 554–555 (1965); *Adderley* v. *Florida,* 385 U. S. 39, 46–48 (1966).

---

[33] The general library consists of more than 3,000 hardback books, which include general reference texts and fiction and nonfiction works, and more than 5,000 assorted paperbacks, including fiction and nonfiction. The MCC offers for sale to inmates four daily newspapers and certain magazines. Joint App. in Nos. 77–2035, 77–2135 (CA2), pp. 102–103 (affidavit of Robert Harris, MCC Education Specialist, dated Oct. 19, 1976). Other paperback books and magazines are donated periodically and distributed among the units for inmate use. *United States ex rel. Wolfish* v. *Levi,* 439 F. Supp., at 131.

## B

Inmates at the MCC were not permitted to receive packages from outside the facility containing items of food or personal property, except for one package of food at Christmas. This rule was justified by MCC officials on three grounds. First, officials testified to "serious" security problems that arise from the introduction of such packages into the institution, the "traditional file in the cake kind of situation" as well as the concealment of drugs "in heels of shoes [and] seams of clothing." App. 80; see *id.*, at 24, 84–85. As in the case of the "publisher-only" rule, the warden testified that if such packages were allowed, the inspection process necessary to ensure the security of the institution would require a "substantial and inordinate amount of available staff time." *Id.*, at 24. Second, officials were concerned that the introduction of personal property into the facility would increase the risk of thefts, gambling, and inmate conflicts, the "age-old problem of you have it and I don't." *Id.*, at 80; see *id.*, at 85. Finally, they noted storage and sanitary problems that would result from inmates' receipt of food packages. *Id.*, at 67, 80. Inmates are permitted, however, to purchase certain items of food and personal property from the MCC commissary.[34]

The District Court dismissed these justifications as "dire predictions." It was unconvinced by the asserted security problems because other institutions allow greater ownership of personal property and receipt of packages than does the MCC. And because the MCC permitted inmates to purchase items in the commissary, the court could not accept official fears of increased theft, gambling, or conflicts if packages were allowed. Finally, it believed that sanitation could be assured by proper housekeeping regulations. Accordingly, it ordered the MCC to promulgate regulations to permit receipt of at least items of the kind that are available in the commissary.

---

[34] Inmates are permitted to spend a total of $15 per week or up to $50 per month at the commissary. *Id.*, at 132.

439 F. Supp., at 152–153. The Court of Appeals accepted the District Court's analysis and affirmed, although it noted that the MCC could place a ceiling on the permissible dollar value of goods received and restrict the number of packages. 573 F. 2d, at 132.

Neither the District Court nor the Court of Appeals identified which provision of the Constitution was violated by this MCC restriction. We assume, for present purposes, that their decisions were based on the Due Process Clause of the Fifth Amendment, which provides protection for convicted prisoners and pretrial detainees alike against the deprivation of their property without due process of law. See *supra*, at 545. But as we have stated, these due process rights of prisoners and pretrial detainees are not absolute; they are subject to reasonable limitation or retraction in light of the legitimate security concerns of the institution.

We think that the District Court and the Court of Appeals have trenched too cavalierly into areas that are properly the concern of MCC officials. It is plain from their opinions that the lower courts simply disagreed with the judgment of MCC officials about the extent of the security interests affected and the means required to further those interests. But our decisions have time and again emphasized that this sort of unguided substitution of judicial judgment for that of the expert prison administrators on matters such as this is inappropriate. See *Jones* v. *North Carolina Prisoners' Labor Union; Pell* v. *Procunier; Procunier* v. *Martinez.* We do not doubt that the rule devised by the District Court and modified by the Court of Appeals may be a reasonable way of coping with the problems of security, order, and sanitation. It simply is not, however, the only constitutionally permissible approach to these problems. Certainly, the Due Process Clause does not mandate a "lowest common denominator" security standard, whereby a practice permitted at one penal institution must be permitted at all institutions.

Corrections officials concluded that permitting the introduction of packages of personal property and food would increase the risks of gambling, theft, and inmate fights over that which the institution already experienced by permitting certain items to be purchased from its commissary. "It is enough to say that they have not been conclusively shown to be wrong in this view." *Jones* v. *North Carolina Prisoners' Labor Union,* 433 U. S., at 132. It is also all too obvious that such packages are handy devices for the smuggling of contraband. There simply is no basis in this record for concluding that MCC officials have exaggerated their response to these serious problems or that this restriction is irrational. It does not therefore deprive the convicted inmates or pretrial detainees [35] of the MCC of their property without due process of law in contravention of the Fifth Amendment.

## C

The MCC staff conducts unannounced searches of inmate living areas at irregular intervals. These searches generally are formal unit "shakedowns" during which all inmates are cleared of the residential units, and a team of guards searches each room. Prior to the District Court's order, inmates were not permitted to watch the searches. Officials testified that permitting inmates to observe room inspections would lead to friction between the inmates and security guards and would allow the inmates to attempt to frustrate the search by distracting personnel and moving contraband from one room to another ahead of the search team.[36]

---

[35] With regard to pretrial detainees, we again note that this restriction affects them for generally a maximum of 60 days. See n. 3, *supra.*

[36] One of the correctional experts testified as follows:

"[T]he requirement that prisoners not be in the immediate area obviously has its basis again in the requirements of security.

"It is quite obvious that if a group of officers start a searching process of a housing area at the MCC, if it be a corridor or an area of rooms or in a

The District Court held that this procedure could not stand as applied to pretrial detainees because MCC officials had not shown that the restriction was justified by "compelling necessity."[37] The court stated that "[a]t least until or unless [petitioners] can show a pattern of violence or other disruptions taxing the powers of control—a kind of showing not remotely approached by the Warden's expressions—the security argument for banishing inmates while their rooms are searched must be rejected." 439 F. Supp., at 149. It also noted that in many instances inmates suspected guards of thievery. *Id.,* at 148–149. The Court of Appeals agreed with the District Court. It saw "no reason whatsoever not to permit a detainee to observe the search of his room and belongings from a reasonable distance," although the court permitted the removal of any detainee who became "obstructive." 573 F. 2d, at 132.

The Court of Appeals did not identify the constitutional provision on which it relied in invalidating the room-search rule. The District Court stated that the rule infringed the detainee's interest in privacy and indicated that this interest in privacy was founded on the Fourth Amendment. 439 F. Supp., at 149–150. It may well be argued that a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore the Fourth Amendment provides no protection for such a

typical jail if it were a cell block, unless all prisoners are removed from that immediate area, there are a wide variety of opportunities for the confiscation of contraband by prisoners who may have such in their possession and cells.

"It can go down the toilet or out the window, swallowed, a wide variety of methods of confiscation of contraband." App. 78.

[37] The District Court did not extend its ruling to convicted inmates because, for them, "the asserted necessities need not be 'compelling,'" and since the warden's explanation of the problems posed was "certainly not weightless," the practice passed the constitutional test for sentenced inmates. 439 F. Supp., at 150.

person. Cf. *Lanza* v. *New York,* 370 U. S. 139, 143–144 (1962). In any case, given the realities of institutional confinement, any reasonable expectation of privacy that a detainee retained necessarily would be of a diminished scope. *Id.,* at 143. Assuming, *arguendo,* that a pretrial detainee retains such a diminished expectation of privacy after commitment to a custodial facility, we nonetheless find that the room-search rule does not violate the Fourth Amendment.

It is difficult to see how the detainee's interest in privacy is infringed by the room-search rule. No one can rationally doubt that room searches represent an appropriate security measure and neither the District Court nor the Court of Appeals prohibited such searches. And even the most zealous advocate of prisoners' rights would not suggest that a warrant is required to conduct such a search. Detainees' drawers, beds, and personal items may be searched, even after the lower courts' rulings. Permitting detainees to observe the searches does not lessen the invasion of their privacy; its only conceivable beneficial effect would be to prevent theft or misuse by those conducting the search. The room-search rule simply facilitates the safe and effective performance of the search which all concede may be conducted. The rule itself, then, does not render the searches "unreasonable" within the meaning of the Fourth Amendment.[38]

---

[38] It may be that some guards have abused the trust reposed in them by failing to treat the personal possessions of inmates with appropriate respect. But, even assuming that in some instances these abuses of trust reached the level of constitutional violations, this is not an action to recover damages for damage to or destruction of particular items of property. This is a challenge to the room-search rule in its entirety, and the lower courts have enjoined enforcement of the practice itself. When analyzed in this context, proper deference to the informed discretion of prison authorities demands that they, and not the courts, make the difficult judgments which reconcile conflicting claims affecting the security of the institution, the welfare of the prison staff, and the property rights of the detainees. *Jones* v. *North Carolina Prisoners' Labor Union,* 433 U. S., at 128.

## D

Inmates at all Bureau of Prisons facilities, including the MCC, are required to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution.[39] Corrections officials testified that visual cavity searches were necessary not only to discover but also to deter the smuggling of weapons, drugs, and other contraband into the institution. App. 70–72, 83–84. The District Court upheld the strip-search procedure but prohibited the body-cavity searches, absent probable cause to believe that the inmate is concealing contraband. 439 F. Supp., at 147–148. Because petitioners proved only one instance in the MCC's short history where contraband was found during a body-cavity search, the Court of Appeals affirmed. In its view, the "gross violation of personal privacy inherent in such a search cannot be outweighed by the government's security interest in maintaining a practice of so little actual utility." 573 F. 2d, at 131.

Admittedly, this practice instinctively gives us the most pause. However, assuming for present purposes that inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility, see *Lanza* v. *New York, supra; Stroud* v. *United States,* 251 U. S. 15, 21 (1919), we nonetheless conclude that these searches do not violate that Amendment. The Fourth Amendment prohibits only unreasonable searches, *Carroll* v. *United States,* 267 U. S. 132, 147 (1925), and under the circumstances, we do not believe that these searches are unreasonable.

---

[39] If the inmate is a male, he must lift his genitals and bend over to spread his buttocks for visual inspection. The vaginal and anal cavities of female inmates also are visually inspected. The inmate is not touched by security personnel at any time during the *visual* search procedure. 573 F. 2d, at 131; Brief for Petitioners 70, 74 n. 56.

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *E. g., United States* v. *Ramsey,* 431 U. S. 606 (1977); *United States* v. *Martinez-Fuerte,* 428 U. S. 543 (1976); *United States* v. *Brignoni-Ponce,* 422 U. S. 873 (1975); *Terry* v. *Ohio,* 392 U. S. 1 (1968); *Katz* v. *United States,* 389 U. S. 347 (1967); *Schmerber* v. *California,* 384 U. S. 757 (1966). A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, App. 71–76, and in other cases. *E. g., Ferraro* v. *United States,* 590 F. 2d 335 (CA6 1978); *United States* v. *Park,* 521 F. 2d 1381, 1382 (CA9 1975). That there has been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises.[40]

---

[40] The District Court indicated that in its view the use of metal detection equipment represented a less intrusive and equally effective alternative to cavity inspections. We noted in *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 556–557, n. 12 (1976), that "[t]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers." However, assuming that the existence of less intrusive alternatives is relevant to the determination of the reasonableness of the particular search method at issue, the alternative suggested by the District Court simply would not be as effective as the visual inspection procedure. Money, drugs, and other non-

We do not underestimate the degree to which these searches may invade the personal privacy of inmates. Nor do we doubt, as the District Court noted, that on occasion a security guard may conduct the search in an abusive fashion. 439 F. Supp., at 147. Such abuse cannot be condoned. The searches must be conducted in a reasonable manner. *Schmerber* v. *California, supra,* at 771–772. But we deal here with the question whether visual body-cavity inspections as contemplated by the MCC rules can *ever* be conducted on less than probable cause. Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we conclude that they can.[41]

## IV

Nor do we think that the four MCC security restrictions and practices described in Part III, *supra,* constitute "punish-

metallic contraband still could easily be smuggled into the institution. Another possible alternative, not mentioned by the lower courts, would be to closely observe inmate visits. See Dept. of Justice, Federal Corrections Policy Task Force, Federal Standards for Corrections (Draft, June 1978). But MCC officials have adopted the visual inspection procedure as an alternative to close and constant monitoring of contact visits to avoid the obvious disruption of the confidentiality and intimacy that these visits are intended to afford. That choice has not been shown to be irrational or unreasonable. Another alternative that might obviate the need for body-cavity inspections would be to abolish contact visits altogether. But the Court of Appeals, in a ruling that is not challenged in this Court and on which we, accordingly, express no opinion, held that pretrial detainees have a constitutional right to contact visits. 573 F. 2d, at 126 n. 16; see *Marcera* v. *Chinlund,* 595 F. 2d 1231 (CA2 1979). See also *Miller* v. *Carson,* 563 F. 2d, at 748–749.

[41] We note that several lower courts have upheld such visual body-cavity inspections against constitutional challenge. See, *e. g., Daughtery* v. *Harris,* 476 F. 2d 292 (CA10), cert. denied, 414 U. S. 872 (1973); *Hodges* v. *Klein,* 412 F. Supp. 896 (NJ 1976); *Bijeol* v. *Benson,* 404 F. Supp. 595 (SD Ind. 1975); *Penn El* v. *Riddle,* 399 F. Supp. 1059 (ED Va. 1975).

ment" in violation of the rights of pretrial detainees under the Due Process Clause of the Fifth Amendment.[42] Neither the District Court nor the Court of Appeals suggested that these restrictions and practices were employed by MCC officials with an intent to punish the pretrial detainees housed there.[43] Respondents do not even make such a suggestion; they simply argue that the restrictions were greater than necessary to satisfy petitioners' legitimate interest in maintaining security. Brief for Respondents 51–53. Therefore, the determination whether these restrictions and practices constitute punishment in the constitutional sense depends on whether they are rationally related to a legitimate nonpunitive governmental purpose and whether they appear excessive in relation to that purpose. See *supra*, at 538–539. Ensuring security and order at the institution is a permissible nonpunitive objective, whether the facility houses pretrial detainees, convicted inmates, or both. *Supra*, at 539–540; see *supra*, at 546–547, and n. 28. For the reasons set forth in Part III, *supra*, we think that these particular restrictions and practices were reasonable responses by MCC officials to legitimate security concerns. Respondents simply have not met their heavy

[42] In determining whether the "publisher-only" rule constitutes punishment, we consider the rule in its present form and in light of the concessions made by petitioners. See *supra*, at 548–550.

[43] The District Court noted that in their post-trial memorandum petitioners stated that "[w]ith respect to sentenced inmates, . . . the restrictions on the possession of personal property also serve the legitimate purpose of punishment." 439 F. Supp., at 153; see Post-trial Memorandum for Respondents in No. 75 Civ. 6000 (SDNY) 212 n. However, below and in this Court, petitioners have relied only on the three reasons discussed *supra*, at 553, to justify this restriction. In our view, this passing reference in a brief to sentenced inmates, which was not supported by citation to the record, hardly amounts to the "substantial confession of error" with respect to pretrial detainees referred to by the District Court. 439 F. Supp., at 153.

burden of showing that these officials have exaggerated their response to the genuine security considerations that actuated these restrictions and practices. See n. 23, *supra*. And as might be expected of restrictions applicable to pretrial detainees, these restrictions were of only limited duration so far as the MCC pretrial detainees were concerned. See n. 3, *supra*.

## V

There was a time not too long ago when the federal judiciary took a completely "hands-off" approach to the problem of prison administration. In recent years, however, these courts largely have discarded this "hands-off" attitude and have waded into this complex arena. The deplorable conditions and Draconian restrictions of some of our Nation's prisons are too well known to require recounting here, and the federal courts rightly have condemned these sordid aspects of our prison systems. But many of these same courts have, in the name of the Constitution, become increasingly enmeshed in the minutiae of prison operations. Judges, after all, are human. They, no less than others in our society, have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination. But under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan. This does not mean that constitutional rights are not to be scrupulously observed. It does mean, however, that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution or, in the case of a federal prison, a statute. The wide range of "judgment calls" that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government.

The judgment of the Court of Appeals is, accordingly, reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL, concurring in part and dissenting in part.

I join the opinion of the Court except the discussion and holding with respect to body-cavity searches. In view of the serious intrusion on one's privacy occasioned by such a search, I think at least some level of cause, such as a reasonable suspicion, should be required to justify the anal and genital searches described in this case. I therefore dissent on this issue.

MR. JUSTICE MARSHALL, dissenting.

The Court holds that the Government may burden pretrial detainees with almost any restriction, provided detention officials do not proclaim a punitive intent or impose conditions that are "arbitrary or purposeless." *Ante,* at 539. As if this standard were not sufficiently ineffectual, the Court dilutes it further by according virtually unlimited deference to detention officials' justifications for particular impositions. Conspicuously lacking from this analysis is any meaningful consideration of the most relevant factor, the impact that restrictions may have on inmates. Such an approach is unsupportable, given that all of these detainees are presumptively innocent and many are confined solely because they cannot afford bail.[1]

---

[1] The Bail Reform Act, 18 U. S. C. § 3146, to which the Court adverts *ante,* at 524, provides that bail be set in an amount that will "reasonably assure" the defendant's presence at trial. In fact, studies indicate that bail determinations frequently do not focus on the individual defendant but only on the nature of the crime charged and that, as administered, the system penalizes indigent defendants. See, *e. g.,* ABA Project on Standards for Criminal Justice, Pretrial Release 1–2 (1968); W. Thomas,

In my view, the Court's holding departs from the precedent it purports to follow and precludes effective judicial review of the conditions of pretrial confinement. More fundamentally, I believe the proper inquiry in this context is not whether a particular restraint can be labeled "punishment." Rather, as with other due process challenges, the inquiry should be whether the governmental interests served by any given restriction outweigh the individual deprivations suffered.

I

The premise of the Court's anlaysis is that detainees, unlike prisoners, may not be "punished." To determine when a particular disability imposed during pretrial detention is punishment, the Court invokes the factors enunciated in *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 168–169 (1963), quoted *ante,* at 537–538 (footnotes omitted):

"Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions."

A number of the factors enunciated above focus on the nature and severity of the impositions at issue. Thus, if weight were given to all its elements, I believe the *Mendoza-Martinez* inquiry could be responsive to the impact of the

Bail Reform in America 11–19 (1976). See also National Advisory Commission on Criminal Justice Standards and Goals, Corrections 102–103 (1973); National Association of Pretrial Service Agencies, Performance Standards and Goals for Pretrial Release and Diversion 1–3 (1978).

deprivations imposed on detainees. However, within a few lines after quoting *Mendoza-Martinez,* the Court restates the standard as whether there is an expressed punitive intent on the part of detention officials, and, if not, whether the restriction is rationally related to some nonpunitive purpose or appears excessive in relation to that purpose. *Ante,* at 538–539. Absent from the reformulation is any appraisal of whether the sanction constitutes an affirmative disability or restraint and whether it has historically been regarded as punishment. Moreover, when the Court applies this standard, it loses interest in the inquiry concerning excessiveness, and, indeed, eschews consideration of less restrictive alternatives, practices in other detention facilities, and the recommendations of the Justice Department and professional organizations. See *ante,* at 542–543, n. 25, 543–544, n. 27, 554. By this process of elimination, the Court contracts a broad standard, sensitive to the deprivations imposed on detainees, into one that seeks merely to sanitize official motives and prohibit irrational behavior. As thus reformulated, the test lacks any real content.

A

To make detention officials' intent the critical factor in assessing the constitutionality of impositions on detainees is unrealistic in the extreme. The cases on which the Court relies to justify this narrow focus all involve legislative Acts, not day-to-day administrative decisions. See *Kennedy* v. *Mendoza-Martinez, supra* (Nationality Act of 1940 and Immigration and Nationality Act of 1952); *Flemming* v. *Nestor,* 363 U. S. 603 (1960) (Social Security Act); *De Veau* v. *Braisted,* 363 U. S. 144 (1960) (New York Waterfront Commission Act). In discerning the intent behind a statutory enactment, courts engage in a familiar judicial function, usually with the benefit of a legislative history that preceded passage of the statute. The motivation for policies in detention facilities, however, will frequently not be a matter of pub-

lic record. Detainees challenging these policies will therefore bear the substantial burden of establishing punitive intent on the basis of circumstantial evidence or retrospective explanations by detention officials, which frequently may be self-serving. Particularly since the Court seems unwilling to look behind any justification based on security,[2] that burden will usually prove insurmountable.

In any event, it will often be the case that officials believe, erroneously but in good faith, that a specific restriction is necessary for institutional security. As the District Court noted, "zeal for security is among the most common varieties of official excess," *United States ex rel. Wolfish* v. *Levi,* 439 F. Supp. 114, 141 (SDNY 1977), and the litigation in this area corroborates that conclusion.[3] A standard that focuses

---

[2] Indeed, the Court glosses over the Government's statement in its post-trial memorandum that for inmates serving sentences, "the restrictions on the possession of personal property also serve the legitimate purpose of punishment." *United States ex rel. Wolfish* v. *Levi,* 439 F. Supp. 114, 153 (SDNY 1977); Post-trial Memorandum for Respondents in No. 75 Civ. 6000 (SDNY) 212 n., quoted *ante,* at 561 n. 43. This statement provides at least some indication that a similar motive may underlie application of the same rules to detainees. The Court's treatment of this point illustrates the indifference with which it pursues the intent inquiry.

[3] Thus, for example, lower courts have held a variety of security restrictions unconstitutional. *E. g., Collins* v. *Schoonfield,* 344 F. Supp. 257, 283 (Md. 1972) (warden censored newspaper articles critical of his administration of jail); *id.,* at 278 (mentally disturbed detainees shackled in jail infirmary); *Inmates of Milwaukee County Jail* v. *Petersen,* 353 F. Supp. 1157, 1164 (ED Wis. 1973) (detainees limited to two pages per letter; notice to relatives and friends of the time and place of detainee's next court appearance deleted on security grounds); *United States ex rel. Manicone* v. *Corso,* 365 F. Supp. 576 (EDNY 1973) (newspapers banned because they might disrupt prisoners and create a fire hazard); *Miller* v. *Carson,* 401 F. Supp. 835, 878 (MD Fla. 1975), aff'd, 563 F. 2d 741 (CA5 1977) (detainees in hospital kept continuously chained to bed); *O'Bryan* v. *County of Saginaw,* 437 F. Supp. 582 (ED Mich. 1977) (detainees with bail of more than $500 prevented from attending religious services); *Vest* v. *Lubbock County Commissioners Court,* 444 F. Supp. 824 (ND Tex.

on punitive intent cannot effectively eliminate this excess. Indeed, the Court does not even attempt to "detail the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention." *Ante,* at 540. Rather, it is content merely to recognize that "the effective management of the detention facility . . . is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment." *Ibid.*

Moreover, even if the inquiry the Court pursues were more productive, it simply is not the one the Constitution mandates here. By its terms, the Due Process Clause focuses on the nature of deprivations, not on the persons inflicting them. If this concern is to be vindicated, it is the effect of conditions of confinement, not the intent behind them, that must be the focal point of constitutional analysis.

## B

Although the Court professes to go beyond the direct inquiry regarding intent and to determine whether a particular imposition is rationally related to a nonpunitive purpose, this exercise is at best a formality. Almost any restriction on detainees, including, as the Court concedes, chains and shackles, *ante,* at 539 n. 20, can be found to have some rational relation to institutional security, or more broadly, to "the effective management of the detention facility." *Ante,* at 540. See *Feeley* v. *Sampson,* 570 F. 2d 364, 380 (CA1 1977) (Coffin, C. J., dissenting). Yet this toothless standard applies irrespective of the excessiveness of the restraint or the nature of the rights infringed.[4]

_____

1977) (detainees limited to three pages per letter and six incoming and outgoing letters per week to facilitate censorship; guards authorized to refuse to mail or deliver letters containing "abusive" language).

[4] The Court does concede that "loading a detainee with chains and shackles and throwing him in a dungeon," *ante,* at 539 n. 20, would create

Moreover, the Court has not in fact reviewed the rationality of detention officials' decisions, as *Mendoza-Martinez* requires. Instead, the majority affords "wide-ranging" deference to those officials "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Ante,* at 547.[5] Reasoning that security considerations in jails are little different than in prisons, the Court concludes that cases requiring substantial deference to *prison* administrators' determinations on security-related issues are equally applicable in the present context. *Ante,* at 546–547, nn. 28, 29.

Yet as the Court implicitly acknowledges, *ante,* at 545, the rights of detainees, who have not been adjudicated guilty of a crime, are necessarily more extensive than those of prisoners "who have been found to have violated one or more of the criminal laws established by society for its orderly governance." *Jones* v. *North Carolina Prisoners' Union,* 433 U. S. 119, 129 (1977). See *Campbell* v. *McGruder,* 188 U. S. App. D. C. 258, 264 n. 9, 580 F. 2d 521, 527 n. 9 (1978). Judicial tolerance of substantial impositions on detainees must be concomitantly less. However, by blindly deferring to administrative judgments on the rational basis for particular restrictions, the Court effectively delegates to detention officials the decision whether pretrial detainees have been punished. This, in my view, is an abdication of an unquestionably judicial function.

## II

Even had the Court properly applied the punishment test, I could not agree to its use in this context. It simply does

an inference of punitive intent and hence would be impermissible. I am indeed heartened by this concession, but I do not think it sufficient to give force to the Court's standard.

[5] Indeed, lest the point escape the reader, the majority reiterates it 12 times in the course of the opinion. *Ante,* at 531, 540–541, n. 23, 544, 546–548, and nn. 29 and 30, 551, 554, 557 n. 38, 562.

not advance analysis to determine whether a given deprivation imposed on detainees constitutes "punishment." For in terms of the nature of the imposition and the impact on detainees, pretrial incarceration, although necessary to secure defendants' presence at trial, is essentially indistinguishable from punishment.[6] The detainee is involuntarily confined and deprived of the freedom "to be with his family and friends and to form the other enduring attachments of normal life," *Morrissey* v. *Brewer,* 408 U. S. 471, 482 (1972). Indeed, this Court has previously recognized that incarceration is an "infamous punishment." *Flemming* v. *Nestor,* 363 U. S., at 617; see also *Wong Wing* v. *United States,* 163 U. S. 228, 233–234 (1896); *Ingraham* v. *Wright,* 430 U. S. 651, 669 (1977). And if the effect of incarceration itself is inevitably punitive, so too must be the cumulative impact of those restraints incident to that restraint.[7]

A test that balances the deprivations involved against the state interests assertedly served [8] would be more consistent

---

[6] As Chief Judge Coffin has stated, "[i]t would be impossible, without playing fast and loose with the English language, for a court to examine the conditions of confinement under which detainees are incarcerated . . . and conclude that their custody was not punitive in effect if not in intent." *Feeley* v. *Sampson,* 570 F. 2d 364, 380 (CA1 1978) (dissenting opinion). Accord, *Campbell* v. *McGruder,* 188 U. S. App. D. C. 258, 267, 580 F. 2d 521, 530 (1978).

[7] If a particular imposition could be termed "punishment" under the *Mendoza-Martinez* criteria, I would, of course, agree that it violates the Due Process Clause. My criticism is that, in this context, determining whether a given restraint constitutes punishment is an empty semantic exercise. For pretrial incarceration is in many respects no different from the sanctions society imposes on convicted criminals. To argue over a question of characterization can only obscure what is in fact the appropriate inquiry, the actual nature of the impositions balanced against the Government's justifications.

[8] See *New Motor Vehicle Board* v. *Orrin W. Fox Co.,* 439 U. S. 96, 112–113 (1978) (MARSHALL, J., concurring); *Poe* v. *Ullman,* 367 U. S. 497, 542 (1961) (Harlan, J., dissenting); *Moore* v. *East Cleveland,* 431 U. S. 494, 499 (1977); *Roe* v. *Wade,* 410 U. S. 113, 115 (1973).

with the import of the Due Process Clause. Such an approach would be sensitive to the tangible physical and psychological harm that a particular disability inflicts on detainees and to the nature of the less tangible, but significant, individual interests at stake. The greater the imposition on detainees, the heavier the burden of justification the Government would bear. See *Bates* v. *Little Rock,* 361 U. S. 516, 524 (1960); *Shapiro* v. *Thompson,* 394 U. S. 618, 634 (1969); *Kusper* v. *Pontikes,* 414 U. S. 51, 58–59 (1973).

When assessing the restrictions on detainees, we must consider the cumulative impact of restraints imposed during confinement. Incarceration of itself clearly represents a profound infringement of liberty, and each additional imposition increases the severity of that initial deprivation. Since any restraint thus has a serious effect on detainees, I believe the Government must bear a more rigorous burden of justification than the rational-basis standard mandates. See *supra,* at 567. At a minimum, I would require a showing that a restriction is substantially necessary to jail administration. Where the imposition is of particular gravity, that is, where it implicates interests of fundamental importance [9] or inflicts significant harms, the Government should demonstrate that the restriction serves a compelling necessity of jail administration.[10]

In presenting its justifications, the Government could adduce evidence of the security and administrative needs of

---

[9] See, *e. g., Brandenburg* v. *Ohio,* 395 U. S. 444, 448 (1969) (free speech); *Bounds* v. *Smith,* 430 U. S. 817 (1977) (access to the courts).

[10] Blackstone observed over 200 years ago:
"Upon the whole, if the offence be not bailable, or the party cannot find bail, he is to be committed to the county gaol by the *mittimus* of the justice . . . ; there to abide till delivered by due course of law. . . . But this imprisonment, as has been said, is only for safe custody, and not for punishment: therefore, in his dubious interval between the commitment and trial, a prisoner ought to be used with the utmost humanity; and neither be loaded with needless fetters, or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only . . . ." 4 W. Blackstone, Commentaries *300.

the institution as well as the fiscal constraints under which it operates. And, of course, considerations of competence and comity require some measure of deference to the judgments of detention officials. Their estimation of institutional needs and the administrative consequences of particular acts is entitled to weight. But as the Court has repeatedly held in the prison context, judicial restraint "cannot encompass any failure to take cognizance of valid constitutional claims." *Procunier* v. *Martinez,* 416 U. S. 396, 405 (1974); *Bounds* v. *Smith,* 430 U. S. 817, 832 (1977). Even more so here, with the rights of presumptively innocent individuals at stake, we cannot abdicate our judicial responsibility to evaluate independently the Government's asserted justifications for particular deprivations. In undertaking this evaluation, courts should thus examine evidence of practices in other detention and penal facilities. To be sure, conditions of detention should not survive constitutional challenge merely because they are no worse than circumstances in prisons. But this evidence can assist courts in evaluating justifications based on security, administrative convenience, and fiscal constraints.

Simply stated, the approach I advocate here weighs the detainees' interests implicated by a particular restriction against the governmental interests the restriction serves. As the substantiality of the intrusion on detainees' rights increases, so must the significance of the countervailing governmental objectives.

### III

#### A

Applying this standard to the facts of this case, I believe a remand is necessary on the issue of double-bunking at the MCC. The courts below determined only whether double-bunking was justified by a compelling necessity, excluding fiscal and administrative considerations. Since it was readily ascertainable that the Government could not prevail under that test, detailed inquiry was unnecessary. Thus, the Dis-

trict Court granted summary judgment, without a full record on the psychological and physical harms caused by overcrowding.[11] To conclude, as the Court does here, that double-bunking has not inflicted "genuine privations and hardship over an extended period of time," *ante,* at 542, is inappropriate where respondents have not had an adequate opportunity to produce evidence suggesting otherwise. Moreover, that the District Court discerned no disputed issues of material fact, see *ante,* at 541 n. 24, is no justification for avoiding a remand, since what is material necessarily varies with the standard applied. Rather than pronouncing overbroad aphorisms about the principles "lurking in the Due Process Clause," *ante,* at 542, I would leave to the District Court in the first instance the sensitive balancing inquiry that the Due Process Clause dictates.[12]

## B

Although the constitutionality of the MCC's rule limiting the sources of hardback books was also decided on summary judgment, I believe a remand is unnecessary.[13] That

---

[11] Other courts have found that in the circumstances before them overcrowding inflicted mental and physical damage on inmates. See, *e. g., Detainees of Brooklyn House of Detention* v. *Malcolm,* 520 F. 2d 392, 396, and n. 4 (CA2 1975) (testimony of correctional experts that double-bunking is "psychologically destructive and increases homosexual impulses, tensions and aggressive tendencies"); *Battle* v. *Anderson,* 564 F. 2d 388, 398 (CA10 1977); *Campbell* v. *McGruder,* 188 U. S. App. D. C., at 273, 580 F. 2d, at 536 (overcrowding likely "to impair the mental and physical health" of detainees); *Chapman* v. *Rhodes,* 434 F. Supp. 1007, 1020 (SD Ohio 1977).

[12] The MCC has a single-bed capacity of 449 inmates. Under the Court's analysis, what is to be done if the inmate population grows suddently to 600, or 900? The Court simply ignores the rated capacity of the institution. Yet this figure is surely relevant in assessing whether overcrowding inflicts harms of constitutional magnitude.

[13] The Court of Appeals' rulings on what this Court broadly designates "security restrictions" applied both to detainees and convicted prisoners. I believe impositions on these groups must be measured under different standards. See *supra,* at 568–571. I would remand to the District Court

individuals have a fundamental First Amendment right to receive information and ideas is beyond dispute. See *Martin* v. *Struthers,* 319 U. S. 141, 143 (1943); *Stanley* v. *Georgia,* 394 U. S. 557, 565 (1969); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 390 (1969); see also *Brandenburg* v. *Ohio,* 395 U. S. 444, 448 (1969). Under the balancing test elaborated above, the Government must therefore demonstrate that its rule infringing on that interest serves a compelling necessity. As the courts below found, the Government failed to make such a showing.[14]

In support of its restriction, the Government presented the affidavit of the MCC warden, who averred without elaboration that a proper and thorough search of incoming hardback books might require removal of the covers. Further, the warden asserted, "in the case of all books and magazines," it would

---

for a determination whether there is a continuing controversy with respect to convicted inmates. If the issues were contested, the body-cavity searches, at the least, would presumably be invalid. Cf. *infra,* at 576–578, and *United States* v. *Lilly,* 576 F. 2d 1240 (CA5 1978).

[14] Nor can the Court's attempt to denominate the publisher-only rule as a reasonable "time, place and manner regulatio[n]," *ante,* at 552, substitute for such a showing. In each of the cases cited by the Court for this proposition, the private individuals had the ability to alter the time, place, or manner of exercising their First Amendment rights. *Grayned* v. *City of Rockford,* 408 U. S. 104 (1972) (ordinance prohibiting demonstration within 150 feet of a school at certain times of the day); *Cox* v. *New Hampshire,* 312 U. S. 569 (1941) (permissible to require license for parade); *Cox* v. *Louisiana,* 379 U. S. 536, 554–555 (1965) (city could prohibit parades during rush hour); *Adderley* v. *Florida,* 385 U. S. 39 (1966) (public demonstration on premises of county jail). It is not clear that the detainees here possess the same freedom to alter the time, place, or manner of exercising their First Amendment rights. Indeed, as the Government acknowledges, Tr. of Oral Arg. 18, an unspecified number of detainees at the MCC are incarcerated because they cannot afford bail. For these persons, the option of purchasing hardback books from publishers or bookstores will frequently be unavailable. And it is hardly consistent with established First Amendment precepts to restrict inmates to library selections made by detention officials.

be necessary to leaf through every page to ascertain that there was no contraband. App. 24. The warden offered no reasons why the institution could not place reasonable limitations on the number of books inmates could receive or use electronic devices and fluoroscopes to detect contraband rather than requiring inmates to purchase hardback books directly from publishers or stores.[15] As the Court of Appeals noted, "other institutions have not recorded untoward experiences with far less restrictive rules." *Wolfish* v. *Levi,* 573 F. 2d 118, 130 (1978).

The limitation on receipt of hardback books may well be *one* rational response to the legitimate security concerns of the institution, concerns which I in no way intend to deprecate. But our precedents, as the courts below apparently recognized, *United States ex rel. Wolfish* v. *United States,* 428 F. Supp. 333, 341 (SDNY 1977); 573 F. 2d, at 130, require some consideration of less restrictive alternatives, see, *e. g., Shelton* v. *Tucker,* 364 U. S. 479, 488–490 (1960); *Keyishian* v. *Board of Regents,* 385 U. S. 589, 602–604 (1967). There is no basis for relaxing this requirement when the rights of presumptively innocent detainees are implicated.

## C

The District Court did conduct a trial on the constitutionality of the MCC package rule and room-search practices. Although the courts below applied a different standard, the record is sufficient to permit resolution of these issues here. And since this Court decides the questions, I think it appropriate to suggest the results that would obtain on this record under my standard.

Denial of the right to possess property is surely of heightened concern when viewed with the other indignities of detainment. See App. 73. As the District Court observed, it is a

---

[15] The MCC already uses such electronic equipment to search packages carried by visitors. See *infra,* at 578.

severe discomfort to do without personal items such as a watch or cosmetics, and things to eat, smoke, or chew. Indeed, the court noted, "[t]he strong dependence upon material things . . . gives rise to one of the deepest miseries of incarceration—the deprivation of familiar possessions." 439 F. Supp., at 150. Given this impact on detainees, the appropriate inquiry is whether the package restriction is substantially necessary to prison administration.

The Government's justification for such a broad rule cannot meet this burden. The asserted interest in ameliorating sanitation and storage problems and avoiding thefts, gambling, and inmate conflicts over personal property is belied, as the Court seems to recognize, *ante,* at 553, by the policy of permitting inmate purchases of up to $15 a week from the prison commissary. Detention officials doubtless have a legitimate interest in preventing introduction of drugs or weapons into the facility. But as both the District Court and the Court of Appeals observed, other detention institutions have adopted much less restrictive regulations than the MCC's governing receipt of packages. See, *e. g., Miller* v. *Carson,* 401 F. Supp. 835, 885 (MD Fla. 1975), aff'd, 563 F. 2d 741 (CA5 1977); *Giampetruzzi* v. *Malcolm,* 406 F. Supp. 836, 842 (SDNY 1975). Inmates in New York state institutions, for example, may receive a 35-pound package each month, as well as clothing and magazines. See 439 F. Supp., at 152.[16]

To be sure, practices in other institutions do not necessarily demarcate the constitutional minimum. See *ante,* at 554. But such evidence does cast doubt upon the Government's justifications based on institutional security and administrative convenience. The District Court held that the Government was obligated to dispel these doubts. The court thus

---

[16] In addition, the Justice Department's Draft Federal Standards for Corrections discourage limitations on the volume or content of inmate mail, including packages. Dept. of Justice, Federal Corrections Policy Task Force, Federal Standards for Corrections 63 (Draft, June 1978).

required a reasoned showing why "there must be deprivations at the MCC so much harsher than deemed necessary in other institutions." 439 F. Supp., at 152. Absent such a showing, the court concluded that the MCC's rule swept too broadly and ordered detention officials to formulate a suitable alternative, at least with respect to items available from the commissary. *Id.,* at 153. This holding seems an appropriate accommodation of the competing interests and a minimal intrusion on administrative prerogatives.

I would also affirm the ruling of the courts below that inmates must be permitted to observe searches of their cells. Routine searches such as those at issue here may be an unavoidable incident of incarceration. Nonetheless, the protections of the Fourth Amendment do not lapse at the jailhouse door, *Bonner* v. *Coughlin,* 517 F. 2d 1311, 1316–1317 (CA7 1975) (Stevens, J.); *United States* v. *Lilly,* 576 F. 2d 1240, 1244–1245 (CA5 1978). Detention officials must therefore conduct such searches in a reasonable manner, avoiding needless intrusions on inmates' privacy. Because unobserved searches may invite official disrespect for detainees' few possessions and generate fears that guards will steal personal property or plant contraband, see 439 F. Supp., at 148–149, the inmates' interests are significant.

The Government argues that allowing detainees to observe official searches would lead to violent confrontations and enable inmates to remove or conceal contraband. However, the District Court found that the Government had not substantiated these security concerns and that there were less intrusive means available to accomplish the institution's objectives. *Ibid.* Thus, this record does not establish that unobserved searches are substantially necessary to jail administration.

D

In my view, the body-cavity searches of MCC inmates represent one of the most grievous offenses against personal

dignity and common decency. After every contact visit with someone from outside the facility, including defense attorneys, an inmate must remove all of his or her clothing, bend over, spread the buttocks, and display the anal cavity for inspection by a correctional officer. Women inmates must assume a suitable posture for vaginal inspection, while men must raise their genitals. And, as the Court neglects to note, because of time pressures, this humiliating spectacle is frequently conducted in the presence of other inmates. App. 77.

The District Court found that the stripping was "unpleasant, embarrassing, and humiliating." 439 F. Supp., at 146. A psychiatrist testified that the practice placed inmates in the most degrading position possible, App. 48, a conclusion amply corroborated by the testimony of the inmates themselves. Id., at 36–37, 41.[17] There was evidence, moreover, that these searches engendered among detainees fears of sexual assault, id., at 49, were the occasion for actual threats of physical abuse by guards, and caused some inmates to forgo personal visits. 439 F. Supp., at 147.

Not surprisingly, the Government asserts a security justification for such inspections. These searches are necessary, it argues, to prevent inmates from smuggling contraband into the facility. In crediting this justification despite the contrary findings of the two courts below, the Court overlooks the critical facts. As respondents point out, inmates are required to wear one-piece jumpsuits with zippers in the front. To insert an object into the vaginal or anal cavity, an inmate would have to remove the jumpsuit, at least from the upper torso. App. 45; Joint App. in Nos. 77–2035, 77–2135 (CA2),

---

[17] While the Government presented psychiatric testimony that the procedures were not likely to create lasting emotional trauma, the District Court intimated some doubt as to the credibility of this testimony, and found that the injury was of constitutional dimension even if it did not require psychiatric treatment or leave permanent psychological scars. 439 F. Supp., at 150.

p. 925 (hereinafter Joint App.). Since contact visits occur in a glass-enclosed room and are continuously monitored by corrections officers, see 439 F. Supp., at 140, 147; Joint App. 144, 1208–1209,[18] such a feat would seem extraordinarily difficult. There was medical testimony, moreover, that inserting an object into the rectum is painful and "would require time and opportunity which is not available in the visiting areas," App. 49–50, and that visual inspection would probably not detect an object once inserted. *Id.*, at 50. Additionally, before entering the visiting room, visitors and their packages are searched thoroughly by a metal detector, fluoroscope, and by hand. *Id.*, at 93; Joint App. 601, 1077. Correction officers may require that visitors leave packages or handbags with guards until the visit is over. Joint App. 1077–1078. Only by blinding itself to the facts presented on this record can the Court accept the Government's security rationale.

Without question, these searches are an imposition of sufficient gravity to invoke the compelling-necessity standard. It is equally indisputable that they cannot meet that standard. Indeed, the procedure is so unnecessarily degrading that it "shocks the conscience." *Rochin* v. *California,* 342 U. S. 165, 172 (1952). Even in *Rochin,* the police had reason to believe that the petitioner had swallowed contraband. Here, the searches are employed absent any suspicion of wrongdoing. It was this aspect of the MCC practice that the Court of Appeals redressed, requiring that searches be conducted only when there is probable cause to believe that the inmate is concealing contraband. The Due Process Clause, on any principled reading, dictates no less.

---

[18] To facilitate this monitoring, MCC officials limited to 25 the number of people in the visiting room at one time. Joint App. 1208. Inmates were forbidden to use the locked lavatories, and visitors could use them only by requesting a key from a correctional officer. App. 93; see *Wolfish* v. *Levi,* 573 F. 2d 118, 125 (1978). The lavatories, as well, contain a built-in window for observation. Brief for Respondents 57.

That the Court can uphold these indiscriminate searches highlights the bankruptcy of its basic analysis. Under the test adopted today, the rights of detainees apparently extend only so far as detention officials decide that cost and security will permit. Such unthinking deference to administrative convenience cannot be justified where the interests at stake are those of presumptively innocent individuals, many of whose only proven offense is the inability to afford bail. I dissent.

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN joins, dissenting.

This is not an equal protection case.[1] An empirical judgment that most persons formally accused of criminal conduct are probably guilty would provide a rational basis for a set of rules that treat them like convicts until they establish their innocence. No matter how rational such an approach might be—no matter how acceptable in a community where equality of status is the dominant goal—it is obnoxious to the concept of individual freedom protected by the Due Process Clause. If ever accepted in this country, it would work a fundamental change in the character of our free society.

Nor is this an Eighth Amendment case.[2] That provision of the Constitution protects individuals convicted of crimes from punishment that is cruel and unusual. The pretrial detainees whose rights are at stake in this case, however, are innocent men and women who have been convicted of no crimes. Their claim is not that they have been subjected to cruel and unusual punishment in violation of the Eighth Amendment, but that to subject them to any form of punishment at all is an unconstitutional deprivation of their liberty.

---

[1] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U. S. Const., Amdt. 14, § 1.

[2] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U. S. Const., Amdt. 8.

This is a due process case.[3]  The most significant—and I venture to suggest the most enduring—part of the Court's opinion today is its recognition of this initial constitutional premise.  The Court squarely holds that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." [4] *Ante,* at 535.

This right to be free of punishment is not expressly embodied in any provision in the Bill of Rights.  Nor is the source of this right found in any statute.  The source of this fundamental freedom is the word "liberty" itself as used in the Due Process Clause, and as informed by "history, reason, the past course of decisions," and the judgment and experience of "those whom the Constitution entrusted" with interpreting that word.  *Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123, 162–163 (Frankfurter, J., concurring).  See *Leis* v. *Flynt,* 439 U. S. 438, 457 (STEVENS, J., dissenting).

In my opinion, this latter proposition is obvious and indisputable.[5]  Nonetheless, it is worthy of emphasis because the Court has now accepted it in principle.  *Ante,* at 535.  In recent years, the Court has mistakenly implied that the concept of liberty encompasses only those rights that are either created by statute or regulation or are protected by an express provision of the Bill of Rights.[6]  Today, however, without the help of any statute, regulation, or express provision of the Constitution, the Court has derived the innocent person's right not to be punished from the Due Process Clause itself. It has accordingly abandoned its parsimonious definition of

---

[3] Because this is a federal facility, it is, of course, the Fifth Amendment that applies.  It provides, in relevant part: "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."

[4] Because MR. JUSTICE MARSHALL does not accept this basis for analysis, see *ante,* at 568–569, I have added this separate dissent even though I agree with much of his analysis and most of his criticism of the Court.

[5] See *Meachum* v. *Fano,* 427 U. S. 215, 230 (STEVENS, J., dissenting).

[6] See *Leis* v. *Flynt,* 439 U. S. 438, 443; *Paul* v. *Davis,* 424 U. S. 693.

the "liberty" protected by the majestic words of the Clause. I concur in that abandonment. It is with regard to the scope of this fundamental right that we part company.

I

Some of the individuals housed in the Metropolitan Correction Center (MCC) are convicted criminals.[7] As to them, detention may legitimately serve a punitive goal, and there is strong reason, even apart from the rules challenged here, to suggest that it does.[8] But the same is not true of the detainees who are also housed there and whose rights we are called upon to address. Notwithstanding the impression created by the Court's opinion, see, e. g., ante, at 562, these people are not "prisoners":[9] they have not been convicted of any crimes, and their detention may serve only a more limited, regulatory purpose.[10] See Houchins v. KQED, Inc., 438 U. S. 1, 37-38 (STEVENS, J., dissenting).

---

[7] The facility is used to house convicted persons who are temporarily in New York for court appearances and the like, as well as some who are confined there for the duration of short sentences.

[8] There is neither time, staff, nor opportunity to offer convicted inmates at MCC the kind of training or treatment that is sometimes available in a prison environment.

[9] See Webster's Third International Dictionary 1804 (1961) (As "often" used, a "prison" is "an institution for the imprisonment of persons convicted of major crimes or felonies: a penitentiary as distinguished from a reformatory, local jail, or detention home").

[10] Long-term incarceration and other postconviction sanctions have significant backward-looking, personal, and normative components. Because they are primarily designed to inflict pain or to "correct" the individual because of some past misdeed, the sanctions are considered punitive. See E. Pincoffs, The Rationale of Legal Punishment 51-57 (1966). See also Gregg v. Georgia, 428 U. S. 153, 184, and n. 30 (opinion of STEWART, POWELL, and STEVENS, JJ.); H. Hart, Punishment and Responsibility 4-5 (1968); id., at 158-173; F. Dostoevskii, Crime and Punishment (Coulson transl. 1964); I. Kant, The Philosophy of Law 195-198 (W. Hastie transl. 1887).

By contrast, pretrial detention is acceptable as a means of assuring the

Prior to conviction every individual is entitled to the benefit of a presumption both that he is innocent of prior criminal conduct and that he has no present intention to commit any offense in the immediate future.[11]  That presumption does

detainee's presence at trial and of maintaining his and his fellows' safety in the meantime. Its focus is therefore essentially forward looking, general, and nonnormative. Because this type of government sanction is primarily designed for the future benefit of the public at large and implies no moral judgment about the person affected, it is properly classified as regulatory. See H. Packer, The Limits of the Criminal Sanction 5 (1968).

The Court's bill of attainder cases have recognized the distinction between regulation and punishment in analyzing the concept of "legislative punishment." Thus, on the one hand, post bellum statutes excluding persons who had been sympathetic to the Confederacy from certain professions were found unconstitutional because of the backward-looking focus on the acts of specific individuals. *Ex parte Garland*, 4 Wall. 333; *Cummings* v. *Missouri*, 4 Wall. 277. However, later statutes requiring persons to take loyalty oaths before getting the benefits of certain labor legislation and before being employed in a public job were found constitutional because of their future orientation and more general purpose. *American Communications Assn.* v. *Douds*, 339 U. S. 382, 413–415; *Garner* v. *Board of Public Works*, 341 U. S. 716, 722–725.

[11] On at least two occasions, this Court has relied upon this presumption as a justification for shielding a person awaiting trial from potentially oppressive governmental actions. *McGinnis* v. *Royster*, 410 U. S. 263, 273 ("[I]t would hardly be appropriate for the State to undertake in the pretrial detention period programs to rehabilitate a man still clothed with a presumption of innocence"); *Stack* v. *Boyle*, 342 U. S. 1, 4 ("Unless [the] right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning"). These cases demonstrate that the presumption—or, as it was called last Term, the "assumption"—of innocence that is indulged until evidence has convinced a jury to the contrary beyond a reasonable doubt, see *Taylor* v. *Kentucky*, 436 U. S. 478, 484 n. 12, colors all of the government's actions toward persons not yet convicted. In sum, although there may be some question as to what it means to treat a person as if he were guilty, there can be no dispute that the government may never do so at any point in advance of conviction.

Relying on nothing more than the force of assertion, and without even mentioning *McGinnis* and *Stack*, the Court states that the presumption of innocence "has no application to a determination of the rights of a pretrial

not imply that he may not be detained or otherwise subjected to restraints on the basis of an individual showing of probable cause that he poses relevant risks to the community. For our system of justice has always and quite properly functioned on the assumption that probable cause to believe (1) that a person has committed a crime, and (2) that absent the posting of bail he poses at least some risk of flight,[12] justifies pretrial detention to ensure his presence at trial.[13]

The fact that an individual may be unable to pay for a bail bond, however, is an insufficient reason for subjecting him to indignities that would be appropriate punishment for convicted felons. Nor can he be subject on that basis to onerous restraints that might properly be considered regulatory with respect to particularly obstreperous or dangerous arrestees. An innocent man who has no propensity toward immediate violence, escape, or subversion may not be dumped into a pool of second-class citizens and subjected to restraints designed to regulate others who have. For him, such treatment

---

detainee during confinement before his trial has even begun." *Ante,* at 533. But having so recently reiterated that the presumption is "fundamental," see *Taylor* v. *Kentucky, supra,* at 483, I cannot believe the Court means what it seems to be saying.

[12] In many instances, detention will occur although the risk of flight is exceedingly low. This is because there is "a large class of persons for whom any bail at all is 'excessive bail.' They are the people loosely referred to as 'indigents.' Studies of the operation of the bail system have demonstrated that even at the very lowest levels of bail—say $500, where the bail bond premium may be only $25 or $50—there is a very substantial percentage of persons who do not succeed in making bail and are therefore held in custody pending trial." Packer, *supra* n. 10, at 216.

[13] American jurisdictions have traditionally relied on a pretrial system of "bail or jail" to assure that arrestees appear at trial. *Id.,* at 211. As to the bail aspect of the system, the Eighth Amendment is explicit that whatever steps the Government takes must not be excessive in relation to that purpose. *Stack* v. *Boyle, supra,* at 5. See 18 U. S. C. § 3146 (a). Although not expressed in the Constitution, a like restraint on the other half of the pretrial system is a logical corollary to the "No Excess Bail" Clause.

amounts to punishment. And because the due process guarantee is individual and personal, it mandates that an innocent person be treated as an individual human being and be free of treatment which, as to him, is punishment.[14]

It is not always easy to determine whether a particular restraint serves the legitimate, regulatory goal of ensuring a detainee's presence at trial and his safety and security in the meantime, or the unlawful end of punishment. But the courts have performed that task in the past, and can and should continue to perform it in the future. Having recognized the constitutional right to be free of punishment, the Court may not point to the difficulty of the task as a justification for confining the scope of the punishment concept so narrowly that it effectively abdicates to correction officials the judicial responsibility to enforce the guarantees of due process.

In addressing the constitutionality of the rules at issue in this case, the Court seems to say that as long as the correction officers are not motivated by "an expressed intent to punish" their wards, *ante,* at 538, and as long as their rules are not "arbitrary or purposeless," *ante,* at 539, these rules are an acceptable form of regulation and not punishment. Lest that test be too exacting, the Court abjectly defers to the prison administrator unless his conclusions are " 'conclusively shown to be wrong.' " *Ante,* at 555, quoting *Jones* v. *North Carolina Prisoners' Labor Union,* 433 U. S. 119, 132.[15]

---

[14] Indeed, this Court has recognized on previous occasions that individualization is sometimes necessary to prevent clearly punitive sanctions from being administered in a cruel and unusual manner. *Woodson* v. *North Carolina,* 428 U. S. 280, 304; *Trop* v. *Dulles,* 356 U. S. 86, 100.

[15] Even if the Court were to apply this aspect of its test in a meaningful way, it would add little to the concept of punishment that is impermissible under the Due Process Clause. The Court states this test as follows: "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitution-

Applying this test, the Court concludes that enforcement of the challenged restrictions does not constitute punishment because there is no showing of a subjective intent to punish and there is a rational basis for each of the challenged rules. In my view, the Court has reached an untenable conclusion because its test for punishment is unduly permissive.

The requirement that restraints have a rational basis provides an individual with virtually no protection against punishment. Any restriction that may reduce the cost of the facility's warehousing function could not be characterized as "arbitrary or purposeless" and could not be "conclusively shown" to have no reasonable relation to the Government's mission.[16] This is true even of a restraint so severe that it might be cruel and unusual.

Nor does the Court's intent test ensure the individual the protection that the Constitution guarantees. For the Court seems to use the term "intent" to mean the subjective intent of the jail administrator. This emphasis can only "encourage hypocrisy and unconscious self-deception."[17] While a

---

ally be inflicted upon detainees *qua* detainees." *Ante,* at 539. It is readily apparent that this standard is nothing more than the "rational basis" requirement that even presumptively valid economic and social regulations must satisfy to pass muster under the Due Process Clause. Accordingly, if a court followed the path proposed in the quotation above, it would take unnecessary steps. For governmental activity that affects even minor interests and is "arbitrary or purposeless" is unconstitutional whether or not it is punishment. See, *e. g., Rinaldi* v. *Yeager,* 384 U. S. 305; *Illinois Elections Board* v. *Socialist Workers Party,* 440 U. S. 173.

[16] Beyond excluding expressly intended punishment, the Court puts no restrictions on the goals that it recognizes as legitimate; under its test the Government need only show some rational nexus to security, order, or the apparently open-ended class of "operational concerns" facing the jail administrator, *ante,* at 540, and the restriction will be upheld.

[17] "[The subjective approach] focuses on what an interested party intends rather than on what a detached observer thinks, thereby depriving the distinction [between punishment and other types of government activity] of any pretense to objectivity. If a prison warden thinks that his

subjective intent may provide a sufficient reason for finding that punishment has been inflicted, such an intent is clearly not a necessary nor even the most common element of a punitive sanction.

In short, a careful reading of the Court's opinion reveals that it has attenuated the detainee's constitutional protection against punishment into nothing more than a prohibition against irrational classifications or barbaric treatment. Having recognized in theory that the source of that protection is the Due Process Clause, the Court has in practice defined its scope in the far more permissive terms of equal protection and Eighth Amendment analysis.

Prior to today, our cases have unequivocally adopted a less obeisant and more objective approach to punishment than the one the Court applies here. In my judgment, those decisions provide the framework for the correct analysis of the punishment issue in this case.

The leading case is *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144. The Court's conclusion that the statute in question was punitive was expressly based on "the objective manifestations of congressional purpose." *Id.*, at 169.[18] The Court also recognized that in many cases such manifestations as it relied upon—the wording and construction of predecessor

---

inmates are better off in his custody than they would be in the world outside, then by [the subjective] definition what he is administering is Treatment rather than Punishment. If the legislature that passes a compulsory commitment statute for narcotics addicts is motivated by hostility toward addicts, commitment is Punishment; if it is motivated by compassion, commitment is Treatment. And if it is motivated by both hostility and compassion? Other objections aside, what use can possibly be made of such a definition?

"Other objections cannot be left aside, because they demonstrate that [the subjective] definition not only is unintelligible but leads to quite dangerous consequences. . . . [For] [t]o allow the characterization to turn on the intention of the administrator is to encourage hypocrisy and unconscious self-deception." Packer, *supra* n. 10, at 32–33.

[18] Accord, *United States* v. *Lovett*, 328 U. S. 303, 311.

provisions as well as the congressional Reports on the provision itself, *id.*, at 169–184—would be unavailable[19] or untrustworthy.[20] In such cases, which surely include those in which the actions of an administrator rather than an Act of Congress are at issue, the Court stated that certain other "criteria" must be applied "to the face" of the official action to determine if it is punitive. *Ibid.* Illustrative of these objective "criteria" were several listed by the Court:

> "Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . . ." *Id.,* at 168–169.

Today the Court does not expressly disavow the objective criteria identified in *Mendoza-Martinez.* In fact, in a footnote, see *ante,* at 539 n. 20, it relies on one of those criteria in order to answer an otherwise obvious criticism of the test the Court actually applies in this case. Under the test as the Court explains it today, prison guards could make regular use of dungeons, chains, and shackles, since such practices would make it possible to maintain security with a smaller number of guards. Commendably, however, the Court expressly rejects this application of its test by stating that the avail-

---

[19] Some state courts have had to resort to such criteria even when analyzing the punitive content of legislation because many state assemblies publish no record of their deliberations. *E. g., Starkweather* v. *Blair,* 245 Minn. 371, 71 N. W. 2d 869 (1955).

[20] "[E]ven a clear legislative classification of a statute as 'non-penal' would not alter the fundamental nature of a plainly penal statute." *Trop* v. *Dulles,* 356 U. S., at 95 (plurality opinion).

ability of less harsh alternatives would give rise to an inference that the practice was motivated by an intent to punish.

Although it is not easy to reconcile the footnote rejection of chains and shackles with the rest of the Court's analysis, this footnote confirms my view that a workable standard must allow a court to infer that punishment has been inflicted by evaluating objective criteria such as those delineated in *Mendoza-Martinez*. When sanctions involve "affirmative disabilit[ies]" and when they have "historically been regarded as a punishment," *Kennedy* v. *Mendoza-Martinez*, 372 U. S., at 168–169, courts must be sensitive to the possibility that those sanctions are punitive. So, too, when the rules governing detention fail to draw any distinction among those who are detained—suggesting that all may be subject to rules designed for the most dangerous few—careful scrutiny must be applied. Finally, and perhaps most important, when there is a significant and unnecessary disparity between the severity of the harm to the individual and the demonstrated importance of the regulatory objective, see *ibid.*, courts must be justified in drawing an inference of punishment.

## II

When measured against an objective standard, it is clear that the four rules discussed in Part III of the Court's opinion are punitive in character. All of these rules were designed to forestall the potential harm that might result from smuggling money, drugs, or weapons into the institution. Such items, it is feared, might be secreted in hard-cover books, packages of food or clothing, or body cavities. That fear provides the basis for a total prohibition on the receipt of hard-cover books (except from publishers, book clubs, or bookstores) or packages of food, for a visual search of body cavities after every visit, and for excluding the detainee from his cell while his personal belongings are searched by a guard.

There is no question that jail administrators have a legitimate interest in preventing smuggling. But it is equally

clear that that interest is being served here in a way that punishes many if not all of the detainees.

The challenged practices concededly deprive detainees of fundamental rights and privileges of citizenship beyond simply the right to leave. The Court recognizes this premise, but it dismisses its significance by asserting that detainees may be subjected to the " 'withdrawal or limitation' " of fundamental rights. *Ante,* at 546, quoting *Price* v. *Johnston,* 334 U. S. 266, 285.[21] I disagree. The withdrawal of rights is

[21] Although the Court's discussion of this point is laced with citations of prison cases such as *Price, ante,* at 545–547, it fails to mention a single precedent dealing with pretrial detainees. Cf. *Houchins* v. *KQED, Inc.,* 438 U. S. 1, 37–38 (STEVENS, J., dissenting); *O'Brien* v. *Skinner,* 414 U. S. 524; *Goosby* v. *Osser,* 409 U. S. 512.

Having concluded that detainees' rights are "limited," the Court is reduced, for example, to analyzing restrictions on First Amendment rights in the deferential language of "minimum rationality"—language traditionally applied to restrictions on economic activities such as selling hot dogs or eyeglasses. *New Orleans* v. *Dukes,* 427 U. S. 297; *Williamson* v. *Lee Optical Co.,* 348 U. S. 483.

The First Amendment is not the only victim of the Court's analysis. It also devalues the Fourth Amendment as it applies to pretrial detainees. This is particularly evident with respect to the Court's discussion of body-cavity searches. Although it recognizes the detainee's constitutionally protected interest in privacy, the Court immediately demeans that interest by affording it "diminished scope." The reason for the diminution is the detainee's limited expectation of privacy. *Ante,* at 557, 558. At first blush, the Court's rationale appears to be that once the detainee is told that he will not be permitted to carry on any of his activities in private, he cannot "reasonably" expect otherwise. But "reasonable expectations of privacy" cannot have this purely subjective connotation lest we wake up one day to headlines announcing that henceforth the Government will not recognize the sanctity of the home but will instead enter residences at will. The reasonableness of the expectation must include an objective component that refers to those aspects of human activity that the "reasonable person" typically expects will be protected from unchecked Government observation. Cf. *Katz* v. *United States,* 389 U. S. 347, 361 (Harlan, J., concurring). Hence, the question must be whether the Government *may,* without violating the Fourth Amendment, tell the detainee by words or by action that he has no or virtually no right to privacy. In my view, the

itself among the most basic punishments that society can exact, for such a withdrawal qualifies the subject's citizenship and violates his dignity.[22] Without question that kind of harm is an "affirmative disability" that "has historically been regarded as a punishment." [23]

This withdrawal of fundamental rights is not limited to those for whom punishment is proper, or to those detainees

---

answer to this question must be negative: despite the fact of his confinement and the impossibility of retreat to the privacy of his home, the detainee must have the right to privacy that we all retain when we venture out into public places. And surely the scope of that privacy is not so diminished that it does not include an expectation that body cavities will not be exposed to view. Absent probable cause, therefore, I would hold that such searches of pretrial detainees may not occur.

[22] The classic example of the coincidence of punishment and the total deprivation of rights is voting. Thus, in *Richardson* v. *Ramirez*, 418 U. S. 24, the Court, although recognizing the importance of the right to vote, *id.*, at 54, see *Reynolds* v. *Sims*, 377 U. S. 533, 561, found support in § 2 of the Fourteenth Amendment for denying convicted felons the right to vote. Cf. *O'Brien* v. *Skinner, supra* (finding certain restrictions on absentee voting by pretrial detainees unconstitutional under the Equal Protection Clause). See also *Goosby* v. *Osser, supra.*

This is certainly not to say that the fact of conviction justifies the total deprivation of all constitutionally protected rights. Having abandoned the concept of the prisoner as a slave of the state, *e. g., Morrissey* v. *Brewer*, 408 U. S. 471, the Court has also rejected any ironclad exclusion of such persons from the protection of the Constitution. *E. g., Wolff* v. *McDonnell*, 418 U. S. 539, 555–556; *Pell* v. *Procunier*, 417 U. S. 817, 822; *Cruz* v. *Beto*, 405 U. S. 319; *Lee* v. *Washington*, 390 U. S. 333. Nonetheless, it also recognizes "that a prison inmate retains [only those] rights that are not inconsistent . . . with the legitimate penological objectives of the corrections system." *Pell* v. *Procunier, supra*, at 822. Cf. *Lanza* v. *New York*, 370 U. S. 139.

[23] *E. g., Wolff* v. *McDonnell, supra*, at 555; *Richardson* v. *Ramirez, supra*, at 43–53. The Court has probably relied upon historical analysis more often than on any of the other objective factors discussed in *Kennedy* v. *Mendoza-Martinez*, in determining whether some government sanction is punitive. *E. g., Cummings* v. *Missouri*, 4 Wall. 277; *Ex parte Wilson*, 114 U. S. 417, 426–429; *Mackin* v. *United States*, 117 U. S. 348, 350–352; *Wong Wing* v. *United States*, 163 U. S. 228, 237–238.

posing special security risks. The MCC houses convicted persons along with pretrial detainees. The former may constitutionally be punished, so long as that punishment is not cruel and unusual. And the fact of their long-term confinement may provide greater justification for concerns with ongoing smuggling operations, violence, or escape.[24] Moreover, there may certainly be among the pretrial detainees, who cannot be punished, some whose background or history suggests a special danger that they will attempt to smuggle contraband into the jail. The rules at issue here, however, are not limited to those who may be constitutionally punished, or to those particularly dangerous detainees for whom onerous restraint is an appropriate regulation. Rather, the rules apply indiscriminately to all.

It is possible, of course, that the MCC officials have determined not to punish the convicted criminals who are confined there, but merely to regulate or detain them. It is possible, too, that as to the detainees, the rules that have been adopted and that are at issue here serve to impose only those restraints

---

[24] The prospect of long-term incarceration facing an inmate increases his incentive to use illicit means to obtain luxuries that his imprisonment would otherwise deny him. Moreover, the fact of long-term incarceration of a large number of persons is conducive to the development of an institutional subeconomy and even subgovernment that often thrives on contraband and is inconsistent with the orderly operation of the facility. See, e. g., H. Mattick, The Prosaic Sources of Prison Violence, Occasional Papers of the University of Chicago Law School, No. 3, Mar. 15, 1972.

As the foregoing indicates, I believe the analysis of the four rules as applied to convicted prisoners is different from that as applied to pretrial detainees. Not only do the due process and other rights of the two have different scope, but the Government's security interests also differ. In my view, the courts below, in erroneously applying the same standards to both sets of inmates and in focusing on detainees, did not adequately develop the record with respect to convicts. Accordingly, I would remand the question of the validity of the four rules in the context of convicted prisoners for further proceedings. Cf. *United States ex rel. Miller* v. *Twomey,* 479 F. 2d 701, 719 (CA7 1973).

needed to regulate the least dangerous of the group. But the Government does not even suggest that the convicted criminals are not being punished during the confinement at MCC.[25] And common sense suggests that if one set of rules is applied indiscriminately to detainees, those rules will serve to regulate the most dangerous—not the least—of the group. Indeed, prison security might well be in jeopardy were it otherwise. If that is true, and if the restraints are as substantial and fundamental as those here, then the conclusion that at least some, if not all, of the detainees are being punished is virtually inescapable.

That this is indeed the case here is confirmed by the excessive disparity between the harm to the individuals occasioned by these rules and the importance of their regulatory objective. The substantiality of the harm to the detainees cannot be doubted. The rights involved are among those that are specifically protected by the Constitution. That fact alone underscores our societal evaluation of their importance. The enforcement of these rules in the MCC, moreover, is a clear affront to the dignity of the detainee as a human being.[26]

[25] In fact, the Government admitted below that the "restrictions on the possession of personal property" at MCC "serve the legitimate purpose of punishment" with respect to convicted inmates as well as the security purposes relied on in the present context of pretrial detainees. *United States ex rel. Wolfish* v. *Levi,* 439 F. Supp. 114, 153 (SDNY 1977).

[26] This affront may itself constitute punishment because of its retributive character. *Mendoza-Martinez* makes clear that a sanction is punitive if it "will promote [a] traditional ai[m] of punishment—retribution." 372 U. S., at 168–169. In its retributive aspect, " '[p]unishment is the way in which society expresses its denunciation for wrong doing.' " *Gregg* v. *Georgia,* 428 U. S., at 184, and n. 30 (opinion of STEWART, POWELL, and STEVENS, JJ.), quoting Lord Justice Denning's testimony before the Royal Commission on Capital Punishment. See also letter from Judge Learned Hand to the editors of the University of · Chicago Law Review (undated), reprinted in 22 U. Chi. L. Rev. 319 (1965); sources cited in the first paragraph of n. 10, *supra.* A focus of this "denunciatory" approach is the right of society, in significant respects, to deny the civic and human dignity

To prohibit detainees from receiving books or packages communicates to the detainee that he, his friends, and his family cannot be trusted. And in the process, it eliminates one of his few remaining contacts with the outside world. The practice of searching the detainee's private possessions in his absence, frequently without care, *United States ex rel. Wolfish* v. *Levi,* 439 F. Supp. 114, 149 (SDNY 1977), offends not only his privacy interest, but also his interest in "minimal dignity," *ibid.* Finally, the search of private body cavities has been found to engender "deep degradation" and "terror" in the inmates, *id.,* at 147: the price of such searches is so high as to lead detainees to forgo visits with friends and family altogether. *Id.,* at 148.

In contrast to these severe harms to the individual, the interests served by these rules appear insubstantial. As to the room searches, nothing more than the convenience of the corrections staff supports the refusal to allow detainees to observe at a reasonable distance. While petitioners have raised the fear that inmates may become violent during such searches and may distract the guards, the District Court specifically found that they had made no showing of any pattern of violence or disruption to support these purported fears. *Id.,* at 149. And absent such a showing, there is no more reason to ban all detainees from observing the searches of their rooms than there would be to ban them from every area in the MCC where guards or other inmates are present.

The prohibitions on receiving books and packages fare no better. The District Court found no record of "untoward experience" with respect to the book rule, *United States ex rel. Wolfish* v. *United States,* 428 F. Supp. 333, 340 (SDNY 1977), and no support in the evidence for the petitioners' "dire predictions" as to packages, 439 F. Supp., at 152. The simple

---

of persons who have been convicted of doing wrong. Cf. *Gregg* v. *Georgia, supra,* at 173, 182 (fundamental violations of "human dignity" may constitute cruel and unusual punishment).

fact is, and the record and the case law make clear, that in many prisons housing criminals convicted of serious crimes— where the inmates as a class may well be more dangerous, where smuggling is likely to be a far more serious problem, and where punishment is appropriate—packages of various sorts are routinely admitted subject to inspection. *Ibid.* The administrators here have hardly established that the corrections staff at MCC is incapable of performing similar inspections with respect to an inmate population which has a far greater entitlement to them. And the unsupported claim that food or goods may be used for barter or may introduce sanitation problems ignores not only the possibility of reasonable regulation, but also the fact that similar goods are sold in the MCC commissary, *id.,* at 152–153, and are no more immune from barter or spoilage.

The body-cavity search—clearly the greatest personal indignity—may be the least justifiable measure of all. After every contact visit a body-cavity search is mandated by the rule. The District Court's finding that these searches have failed in practice to produce any demonstrable improvement in security, *id.,* at 147, is hardly surprising.[27] Detainees and their visitors are in full view during all visits, and are fully clad. To insert contraband in one's private body cavities during such a visit would indeed be "an imposing challenge to nerves and agility." *Ibid.* There is no reason to expect, and the petitioners have established none, that many pretrial detainees would attempt, let alone succeed, in surmounting this challenge absent the challenged rule. Moreover, as the District Court explicitly found, less severe alternatives are available to ensure that contraband is not transferred during visits. *Id.,* at 147–148. Weapons and other dangerous instruments, the items of greatest legitimate concern, may be

---

[27] Indeed, the District Court found the searches entirely ineffective in some of their most offensive manifestations (*e. g.,* anal searches). 439 F. Supp., at 147.

discovered by the use of metal detecting devices or other equipment commonly used for airline security. In addition, inmates are required, even apart from the body-cavity searches, to disrobe, to have their clothing inspected, and to present open hands and arms to reveal the absence of any concealed objects. These alternative procedures, the District Court found, "amply satisf[y]" the demands of security. *Id.,* at 148. In my judgment, there is no basis in this record to disagree.

It may well be, as the Court finds, that the rules at issue here were not adopted by administrators eager to punish those detained at MCC. The rules can all be explained as the easiest way for administrators to ensure security in the jail. But the easiest course for jail officials is not always one that our Constitution allows them to take. If fundamental rights are withdrawn and severe harms are indiscriminately inflicted on detainees merely to secure minimal savings in time and effort for administrators, the guarantee of due process is violated.

In my judgment, each of the rules at issue here is unconstitutional. The four rules do indiscriminately inflict harm on all pretrial detainees in MCC. They are all either unnecessary or excessively harmful, particularly when judged against our historic respect for the dignity of the free citizen. I think it is unquestionably a form of punishment to deny an innocent person the right to read a book loaned to him by a friend or relative while he is temporarily confined, to deny him the right to receive gifts or packages, to search his private possessions out of his presence, or to compel him to exhibit his private body cavities to the visual inspection of a guard. Absent probable cause to believe that a specific individual detainee poses a special security risk, none of these practices would be considered necessary, or even arguably reasonable, if the pretrial detainees were confined in a facility separate and apart from convicted prisoners. If reasons of

convenience justify intermingling the two groups, it is not too much to require the facility's administrator to accept the additional inspection burdens that would result from denying them the right to subject citizens to these humiliating indignities. I would affirm the judgment of the Court of Appeals as to all four of these rules.[28]

### III

The so-called "double-bunking" issue was resolved by the District Court on cross-motions for summary judgment. The record was compiled and the issue decided on the basis of a legal test that all of us now agree was erroneous.[29] If the record is incomplete, or if it discloses any material question of fact concerning the punitive character of the housing conditions at MCC, a remand for trial is required. Three basic facts dictate that result.

First, as earlier emphasized, MCC houses convicted prisoners along with pretrial detainees. Both classes of inmates are subjected to the same conditions. It may be that the Government—despite representations to the contrary, see 439 F. Supp., at 153—conceives of the confinement of convicts in the facility as a vacation for them from the punitive rigors of prison life. But the opposite conclusion—that the detainees are instead being subjected to some of those rigors—is at least an equally justifiable inference from the facts revealed by the record, particularly in view of the other rules applicable to both classes.

Second, the Government acknowledges that MCC has been used to house twice as many inmates as it was designed to

---

[28] The District Court reserved decision on all of these practices save the restriction on receipt of hardback books until a full trial on the merits. It is accordingly appropriate to resolve these issues now without a remand.

[29] I do not understand how the Court, having quite thoroughly demonstrated that the District Court applied an erroneous legal test, ante, at 530, 532–535, can nonetheless rely on that court's conclusion that no disputed issues of material fact prevented it from applying its erroneous test to the housing issue. Ante, at 541 n. 24.

accommodate.[30]   The design capacity of a building is one crucial indication of its purpose.   So is the later abandonment of that design in favor of a substantially more crowded and

[30] "The decisive reality, however, not seriously open to debate, is that the rooms were *designed* and built to hold a single person, not more.   The conclusion is compelled by an array of undisputed facts.   To begin with, petitioners invoke the high authority of the architect who designed the MCC and who, in sworn testimony recorded in this court, has described a room like the ones he drew, housing one inmate, as a 'very basic planning principle.'   Contrasting dormitories with rooms, he went on to say:

" 'Dormitories are a much more flexible kind of a thing, you see.   That is the only real area in that particular facility.   One of the reasons why there's been a tendency to go to single rooms is because it's a very clear and apparent violation of capacity when you try to put two people in a room.   You can't put one and a third persons in a room.   You can always up the population of a space, in which you put people in, and you can through more imaginative planning get better utilization of the space but there is an absoluteness of a room which is designed for one person, and to try to convert it into a two-person room, it's a clear violation of the capability of that space.   There is no question there.   There is more than enough, you know, objections to double-celling.'

"It is not necessary by any means to rely solely on what the architect *said;* the plain visual evidence of what he did demonstrates that the rooms he designed were for one inmate, not two or more.   There is no place for each of two people, assigned by others to this unwanted intimacy, to walk or eat or write a letter or be quiet or be outside another's toilet.   There is one shelf for toiletries and one for other things, neither adequate for two people.   In the larger group of 100 double-celled rooms there is no place to hang a garment.   The double-decker bunks by which these rooms have been changed from singles are so constructed that air from a vent, cold during our winter visit, blows out onto the upper bed a foot or so above body level.   Many of the prisoners have blocked the vents to cope with this architecturally unintended unpleasantness.   And, as a result the rooms are musty and unpleasant smelling.   The single beds originally designed for these rooms each had two drawers built under them, mounted on casters for reasonably convenient use.   In the reconstruction to house two inmates, it was found necessary to dismantle these caster arrangements; now each 'double' room has one of the old drawers lying loose under the lower bed or none at all for the two assigned occupants." *United States ex rel. Wolfish* v. *United States,* 428 F. Supp. 333, 336–337 (SDNY 1977) (footnote omitted; emphasis in original).

oppressive one. Certainly, the inference that what the architect designed to detain, the jailer has used to punish, is permissible, even if it may not be compelled or even probable.

Finally, MCC officials experienced little difficulty in complying with the preliminary order of the District Court to return the facility to its design capacity. The Court dismisses this fact as not *conclusive* on the question of purpose and reasonableness. *Ante,* at 542–543, n. 25. But the fact that the Government's lawful regulatory purpose could so easily be served by less severe conditions is certainly some evidence of a punitive purpose and of excessiveness. If the lawful purpose may be equally served by those new conditions at no greater cost, the record provides a basis for arguing that there is no legitimate reason for the extra degree of severity that has characterized the overcrowded conditions in the past.[31]

While I by no means suggest that any of these facts demonstrates that the detention conditions are punitive,[32] taken

---

[31] To these facts may be added some of the findings of the District Court: (1) Even at design capacity, "movement is more restricted at the MCC than in most other federal facilities," including those that exclusively house convicts, 439 F. Supp., at 125; (2) the doubling of the design capacity of individual cells leaves "no place for each of two people, assigned by others to this unwanted intimacy, to walk or eat or write a letter or be quiet or be outside another's toilet," places the person in the newly added upper bunk directly under the cold air vent, renders some of the furniture designed for the rooms unusable, and in general subjects the inmate to "foul odors, social stigma, humiliation, and denials of minimal privacy," 428 F. Supp., at 337, 339; (3) overall, the "living conditions [are] grossly short of minimal decency, and [have] no semblance of justification except [for] the general defense that the facilities of the Bureau of Prisons are *in toto* insufficient to house all the people consigned to them," 439 F. Supp., at 135. Without so stating expressly, the Court has rejected these findings. *Ante,* at 542–543. Because that rejection is not permissible absent a determination of clear error, and because no such determination has been made, its treatment of the District Court's findings is inexplicable. See *Zenith Radio Corp.* v. *Hazeltine Research, Inc.,* 395 U. S. 100, 123.

[32] The ameliorative factors discussed by the Court, *ante,* at 542–543, might well convince the factfinder that the housing conditions are not punitive.

together they raise an issue of fact that should not be resolved by this Court, or even by the District Court, on a motion for summary judgment.

It is admittedly easier to conclude that the Due Process Clause prohibits preconviction punishment than it is to articulate a standard for determining if such punishment has occurred. But if the standard is to afford any meaningful protection for the citizen's liberty, it must require something more than either an explicit statement by the administrator that his rule is designed to inflict punishment, or a sanction that is so arbitrary that it would be invalid even if it were not punitive. However the test is phrased, it must at least be satisfied by an unexplained and significant disparity between the severity of the harm to the individual and the demonstrated importance of the nonpunitive objective served by it. I therefore respectfully dissent from the conclusion that the demeaning and unnecessary practices described in Part III of the Court's opinion do not constitute punishment, and also from the conclusion that the overcrowded housing conditions discussed in Part II do not even give rise to an inference that they have punitive qualities.